69 Cal.Rptr.3d 487 (2007)
157 Cal.App.4th 1268
VOICES OF the WETLANDS, Plaintiff and Appellant,
v.
CALIFORNIA STATE WATER RESOURCES CONTROL BOARD, et al. Defendants and Appellants. Duke Energy Moss Landing, LLC, et al. Real Parties in Interest and Appellants.
No. H028021.
Court of Appeal of California, Sixth District.
December 14, 2007.
As modified on Denial of Rehearing January 10, 2008.
*494 Deborah A. Sivas, Stanford Law School, Environmental Clinic, Stanford, CA, for Plaintiff and Appellant.
Anita E. Ruud, Office of the Attorney General, San Francisco, CA, for Defendants and Appellants.
Sarah Gemma Flanagan, Pillsbury Winthrop Shaw Pittman, LLP, San Francisco, CA, for Real Parties in Interest and Appellants.
McADAMS, J.
This litigation arose from administrative approvals of a project to modify the Moss Landing Power Plant, which is located in Monterey County. In connection with state energy commission certification proceedings for the project, the regional water board issued a federal water pollution permit. Appellant challenged the issuance of that permit. Following two judicial hearings punctuated by an administrative remand, the trial court dismissed appellant's administrative mandamus petition. This appeal and cross-appeal followed. The complex issues before us include procedural challenges to the trial court's jurisdiction and to its interim remand. The parties also dispute the sufficiency of the evidence supporting issuance of the water permit, both before and after remand, and the proper application of the governing statute. For reasons explained in this opinion, we affirm the trial court's final judgment denying appellant's petition for writ of mandate.

INTRODUCTION
The Parties: This action was initiated by Voices of the Wetlands, petitioner below and appellant and cross-respondent on appeal. Appellant is a nonprofit association of individuals dedicated to preserving Elkhorn Slough. Respondents in the trial court were two state agencies (collectively, the Water Boards): the California State Water Resources Control Board (State Board) and the California Regional Water Quality Control Board, Central Coast Region (Regional Board). Real party in interest are Duke Energy Moss Landing, LLC, and Duke Energy North America, LLC (collectively, Duke). At all times relevant to this litigation, Duke owned and operated the Moss Landing Power Plant, which is located at the mouth of Elkhorn Slough. Both Duke and the Water Boards are respondents and cross-appellants on appeal (collectively, respondents).
The Challenged Administrative Decision: Appellant challenges a permit issued to Duke by the Regional Board, under the National Pollutant Discharge Elimination System (NPDES). The NPDES permit allows Duke to cool the Moss Landing *495 Power Plant using water taken from Moss Landing Harbor and later discharged back into Monterey Bay. According to appellant, the issuance of the NPDES permit here violates federal law, because the Water Boards did not require Duke to use the best technology available to minimize adverse environmental effects, as required by federal law.[1] Citing several specific grounds, appellant attacks the Boards' approval of once-through cooling, claiming that it kills unacceptable numbers of aquatic larvae.
Judicial Proceedings: After the State Board declined to review the issuance of the NPDES permit, appellant brought judicial proceedings in the superior court. Respondents demurred, asserting that the court lacked jurisdiction to hear the matter because the controversy arose from certification proceedings conducted by the California State Energy Resources Conservation and Development Commission (Energy Commission) and judicial review of such proceedings may be had only in the California Supreme Court. After overruling respondents' demurrer, the court conducted a hearing, ordered a limited remand to the Regional Board, and later conducted a second hearing, ultimately denying appellant's writ petition. The ensuing judgment culminated in this appeal and cross-appeal.

BACKGROUND
This litigation arose from Duke's 1999 application to modernize its Moss Landing Power Plant. The plant, previously owned by Pacific Gas and Electric, has been in continuous operation since 1950. Duke proposed to replace five old units at the Moss Landing Power Plant with two new 530-megawatt, natural gas fired, combined cycle generating units.
As described in the Energy Commission's October 2000 decision, the Moss Landing Power Plant is located in a biologically sensitive area, just south of "the Elkhorn Slough National Estuarine Research Reserve, which adjoins the much larger ... Monterey Bay National Marine Sanctuary near Moss Landing Harbor about midway between the cities of Santa Cruz and Monterey." The Elkhorn Slough is "a biological gem" and "a biologically rich wetland system, providing habitat for hundreds of resident and migratory bird species." The slough is home to a "great diversity of rare plants and animals" and it also "serves as an important nursery and source of nutrients for Monterey Bay." And "Elkhorn Slough is one of the few relatively large coastal wetlands remaining in California."
As proposed, the two new generating units would use seawater from the harbor for once-through cooling, the same basic technology utilized by the old units. Under section 316(b) of the federal Clean Water Act, cooling water intake structures must reflect the best technology available (BTA) for minimizing adverse environmental impacts. When a plant draws water in, the environmental effects may include "impingement" and "entrainment." As explained in the Energy Commission's October 2000 decision: "Impingement occurs *496 from suction when the cooling water intake system holds organisms against the traveling screens. Entrainment is where [smaller] aquatic organisms such as larvae and fish eggs are drawn [through the screens] into the [plant's] cooling system." When the cooling water is later discharged at a higher temperature, the water body receiving it may suffer harmful thermal effects. The Regional Board required Duke to address both impingement and entrainment intake effects, as well as the thermal discharge impact.

SYNOPSIS OF PROCEDURAL HISTORY
Starting in 1999, Duke sought administrative approval to modernize the Moss Landing Power Plant. Duke applied for the necessary certification from the Energy Commission. Duke also applied to the Regional Board for an NPDES permit for the modified facility. The two agencies' evaluation processes were integrated. For one thing, as described in the Energy Commission's decision, "the Commission and the RWQCB [Regional Board] formed a Technical Working Group (TWG) made up of representatives from various regulatory agencies, the scientific community, and Duke Energy. The TWG met regularly on a monthly basis beginning in March 1999, holding approximately 13 meetings. The TWG worked to design biological resource studies and then validate the results of these studies."
In October 2000, the Energy Commission approved Duke's application for certification, subject to various conditions including compliance with the requirements of the NPDES permit. In November 2000, the Regional Board approved Duke's NPDES permit. As relevant here, the Regional Board required Duke to "upgrade the existing intake structure for the new units to minimize the impacts due to impingement of larger fish on the traveling screens...." In addition, "the Board, California Energy Commission, and Duke Energy ... developed an acquisition and aquatic habitat enhancement program" designed to "minimize adverse environmental effects of the intake system on the Elkhorn Slough watershed resources," which would be funded by a $7 million payment from Duke.[2] Appellant took an administrative appeal of the permit approval to the State Board, which rejected appellant's petition for administrative review in June 2001.
In July 2001, appellant instituted this judicial action, petitioning the Monterey County Superior Court for a writ of administrative mandamus to set aside the Water Boards' issuance of the NPDES permit. Duke and the Water Boards demurred to the petition, in part on the ground that the superior court lacked subject matter jurisdiction. The Energy Commission filed a memorandum as amicus curiae, supporting respondents' arguments. After the court overruled their demurrers, respondents opposed the petition on the merits.
Following a hearing in September 2002, the court filed its intended decision. In it, the court rejected one of the Regional *497 Board's NPDES permit findings, number 48, which concerned BTA for the cooling system. As the court put it: "Finding number 48 is not supported by the weight of the evidence." The court therefore ordered issuance of a writ of mandate "compelling the Regional Board to conduct a thorough and comprehensive analysis of Best Technology Available applicable to the Moss Landing Power Plant." A writ did not issue, however. Instead, in March 2003, the court entered an order of remand to the Regional Board. The court retained jurisdiction while the remand was pending.
In April 2003, appellant filed a writ petition in this court, which challenged the trial court's decision to remand the matter to the Regional Board without first issuing a writ directing the agency to vacate the entire NPDES permit. We summarily denied appellant's writ petition.
In May 2003, the Regional Board conducted a further public hearing. After considering additional evidence, the Regional Board concluded that the challenged finding was supported by the weight of the evidence. Appellant appealed administratively to the State Board, again without success.
The parties returned to the trial court. In June 2004, the court filed an intended decision upholding the Regional Board's action on remand and denying appellant's petition. The following month, the court issued a statement of decision, reaching the same result.
These appellate proceedings followed.

CONTENTIONS
In its appeal, appellant argues: (1) the administrative remand process was fatally flawed; (2) the Water Boards improperly relied on the availability of an environmental enhancement fund in making the challenged determinations; and (3) the Regional Board erred in making its determination of best technology available, because it failed to apply a discernible standard and it acted with unfettered discretion.
The Water Boards and Duke dispute appellant's arguments. They also raise two additional claims by cross-appeal, both of which appellant refutes: (1) the trial court erred in overruling their demurrers to appellant's petition, because a statute bars judicial review in the superior court in proceedings involving power plant certification; and (2) the court erred in remanding the matter to the Regional Board, because ample evidence supported the original administrative approvals.

STATUTORY FRAMEWORK
We begin by summarizing the statutory framework that governs the issues before us. Because an NPDES permit is at issue here, federal and state water law applies. Because the project is a power plant, state law governing power plant approvals also comes into play. We briefly describe each pertinent body of law.

I. Federal Water Quality Law: The Clean Water Act
"The United States Environmental Protection Agency (EPA) regulates water quality in the nation's navigable waters pursuant to several statutes, the most important of which is the Clean Water Act." (2 Manaster & Selmi, Cal. Environmental Law and Land Use Practice (2004) Water Quality Regulators, § 30.40, p. 30-55, fn. omitted.) The Clean Water Act (CWA) is codified at 33 U.S.C. §§ 1251-1387; its official name is the Federal Water Pollution Control Act (FWPCA). (See, e.g., City of Burbank v. State Water Resources Control Bd. (2005) 35 Cal.4th 613, 620, 26 Cal.Rptr.3d 304, 108 P.3d 862.)

*498 A. Overview

Congress passed the Clean Water Act in its present form in 1972. (Rapanos v. United States (2006) ___ U.S. ___, 126 S.Ct. 2208, 2225-2227, 165 L.Ed.2d 159 (plur. opn.).) With that legislation, Congress "established a comprehensive water quality policy for the nation." (City of Burbank v. State Water Resources Control Bd., supra, 35 Cal.4th at p. 626, 26 Cal. Rptr.3d 304,108 P.3d 862.)
"Before it was amended in 1972, the Federal Water Pollution Control Act employed ambient water quality standards specifying the acceptable levels of pollution in a State's interstate navigable waters as the primary mechanism in its program for the control of water pollution." (Environmental Protection Agency v. State Water Resources Control Board (1976) 426 U.S. 200, 202, 96 S.Ct. 2022, 48 L.Ed.2d 578, fns. omitted.) Under that system, it was "very difficult to develop and enforce standards to govern the conduct of individual polluters." (Id. at pp. 202-203, 96 S.Ct. 2022.) "In 1972, prompted by the conclusion of the Senate Committee on Public Works that `the Federal water pollution control program ... has been inadequate in every vital aspect,' Congress enacted the Amendments" that make up the current law. (Id. at p. 203, 96 S.Ct. 2022, fn. omitted.)
The 1972 federal legislation "introduced two major changes in the methods to set and enforce standards to abate and control water pollution. First, the Amendments are aimed at achieving maximum `effluent limitations' on `point sources,' as well as achieving acceptable water quality standards. A point source is `any discernible, confined and discrete conveyance ... from which pollutants are or may be discharged.' An `effluent limitation' in turn is `any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources ... including schedules of compliance.'" (Environmental Protection Agency v. State Water Resources Control Board, supra, 426 U.S. at p. 204, 96 S.Ct. 2022, fns. omitted, citing 33 U.S.C. §§ 1251, 1262.) "Second, the Amendments establish the National Pollutant Discharge Elimination System (NPDES) as a means of achieving and enforcing the effluent limitations. Under the NPDES, it is unlawful for any person to discharge a pollutant without obtaining a permit and complying with its terms. An NPDES permit serves to transform generally applicable effluent limitations and other standards including those based on water quality into the obligations (including a timetable for compliance) of the individual discharger, and the Amendments provide for direct administrative and judicial enforcement of permits." (Id. at p. 205, 96 S.Ct. 2022, fns. omitted, citing 33 U.S.C. §§ 1319,1365.)
The goal of the 1972 act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." (33 U.S.C.A. § 1251(a); see Rapanos v. United States, supra, ___ U.S. ___, 126 S.Ct. 2208, 165 L.Ed.2d 159.)

B. Operation
Congress entrusted the EPA with primary authority for implementing the Clean Water Act. (33 U.S.C.A. § 1251; see generally 2 Manaster & Selmi, Cal. Environmental Law, supra, § 30.40, p. 313-55.) The EPA's statutory authority includes responsibility for issuing NPDES permits. (33 U.S.C.A. § 1342(a).)
"Congress also provided that a State may issue NPDES permits `for discharges into navigable waters within its jurisdiction,' but only upon EPA approval of the State's proposal to administer its own program." *499 (Environmental Protection Agency v. State Water Resources Control Board, supra, 426 U.S. at p. 208, 96 S.Ct. 2022; 33 U.S.C.A. § 1342(b).) "Under the federal Clean Water Act, each state is free to enforce its own water quality laws so long as its effluent limitations are not `less stringent' than those set out in the Clean Water Act. (33 U.S.C. § 1370.)" (City of Burbank v. State Water Resources Control Bd., supra, 35 Cal.4th at p. 620, 26 Cal. Rptr.3d 304, 108 P.3d 862.) In such cases, the EPA suspends its issuance of NPDES permits in favor of the state's approved program. (33 U.S.C.A. § 1342(b); Environmental Protection Agency v. State Water Resources Control Board, supra, 426 U.S. at p. 208, fn. 17, 96 S.Ct. 2022.) But the EPA "retains authority to review operation of a State's permit program." (Id. at p. 208, 96 S.Ct. 2022; see also, e.g., National Association of Home Builders v. Defenders of Wildlife (2007) ___ U.S. ___, 127 S.Ct. 2518, 2525, 168 L.Ed.2d 467; ibid., fn. 1.)

II. State Water Law: the Porter-Cologne Act
"In California, the controlling law is the Porter-Cologne Water Quality Control Act (Porter-Cologne Act), which was enacted in 1969." (City of Burbank v. State Water Resources Control Bd., supra, 35 Cal.4th at p. 619, 26 Cal.Rptr.3d 304, 108 P.3d 862.) The Porter-Cologne Act preceded the federal Clean Water Act by three years. (Id. at p. 625, 26 Cal.Rptr.3d 304, 108 P.3d 862.) The state statute is codified in the Water Code, Division 7, at sections 13000-14076.

A. Overview
The goal of the Porter-Cologne Act "is `to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible.'" (City of Burbank v. State Water Resources Control Bd., supra, 35 Cal.4th at p. 619, 26 Cal. Rptr.3d 304, 108 P.3d 862, quoting Wat. Code, § 13000.) "The task of accomplishing this belongs to the State Water Resources Control Board (State Board) and the nine Regional Water Quality Control Boards; together the State Water Board and the Regional Water Boards comprise `the principal state agencies with primary responsibility for the coordination and control of water quality.'" (Ibid., quoting Wat.Code, § 13001.)
In 1972, the California Legislature amended the "Porter-Cologne Act `to ensure consistency with the requirements for state programs implementing the Federal Water Pollution Control Act.' ([Wat.Code] § 13372.)" (City of Burbank v. State Water Resources Control Bd., supra, 35 Cal.4th at p. 620, 26 Cal.Rptr.3d 304, 108 P.3d 862.) "On May 14, 1973, the Acting EPA Administrator approved the State of California's request to administer its own NPDES permit program and, effective that date, suspended EPA issuance of all permits for `all discharges in the State of California, other than those from agencies and instrumentalities of the Federal government.'" (Environmental Protection Agency v. State Water Resources Control Board, supra, 426 U.S. at p. 209, 96 S.Ct. 2022.) "California was the first state in the nation to be authorized to issue National Pollutant Discharge Elimination System (NPDES) permits, which regulate the discharge of pollutants to surface waters." (2 Manaster & Selmi, Cal. Environmental Law, supra, § 31.08, p. 31-13, fn. omitted.)
The state's water agencies thus perform a "dual role" of "implementing state law relating to water quality and carrying out *500 a delegated administrative responsibility over the more precise and far-reaching system of federal law." (WaterKeepers Northern California v. State Water Resources Control Bd. (2002) 102 Cal.App.4th 1448,1451-1452,126 Cal.Rptr.2d 389.)

B. Operation
"In California, wastewater discharge requirements established by the Regional Water Boards are the equivalent of the NPDES permits required by federal law. ([Wat.Code] § 13374.)" (City of Burbank v. State Water Resources Control Bd., supra, 35 Cal.4th at p. 621, 26 Cal.Rptr.3d 304, 108 P.3d 862.) But Water Code section 13374 requires "equivalency only for purposes of state compliance with the minimum requirements of the federal mandate. The federal law does not preclude the state from utilizing its broader authority to regulate [other] sources of pollution by means of its waste discharge permit system." (Tahoe-Sierra Preservation Council v. State Water Resources Control Bd. (1989) 210 Cal.App.3d 1421, 1431, 259 Cal.Rptr. 132.)
In issuing federal NPDES permits under the Clean Water Act, the State Board "is designated as the state water pollution control agency for all purposes stated in the Federal Water Pollution Control Act [i.e., the Clean Water Act]." (Wat.Code, § 13160.) California implements its delegated permitting authority through its regional water boards. (See Wat.Code, § 13263; see also, id., §§ 13260, 13376; see generally, 2 Manaster & Selmi, Cal. Environmental Law, supra, § 30.40, p. 30-55; 57 Ops.Atty.Gen. 19, 20 (1974).) The Regional Water Boards are also responsible for implementing state water law. "The actual administration of the Porter-Cologne Act rests on the power of the Regional Boards to prescribe waste discharge requirements for all persons discharging waste into inland surface waters, enclosed bays and estuaries within their jurisdiction. (Wat.Code, § 13263.)" (WaterKeepers Northern California v. State Water Resources Control Bd., supra, 102 Cal.App.4th at p. 1452, 126 Cal.Rptr.2d 389.) California's "statewide program of water quality control ... provides for regional administration within the framework of statewide coordination and policy." (Hampson v. Superior Court (1977) 67 Cal. App.3d 472, 484, 136 Cal.Rptr. 722.)

C. Review
"A party who is aggrieved by an order or decision of a regional board may seek administrative review of that order or decision by petition to the State Board. (Wat.Code, § 13320, subd. (a).)" (Johnson v. State Water Resources Control Bd. (2004) 123 Cal.App.4th 1107, 1112, 20 Cal. Rptr.3d 441; see also, e.g., Cal.Code of Regs., tit. 23, § 2050; Hampson v. Superior Court, supra, 67 Cal.App.3d at p. 484, 136 Cal.Rptr. 722.) Administrative review by the State Board is discretionary. (Johnson v. State Water Resources Control Bd., at pp. 1112-1113, 20 Cal.Rptr.3d 441; People ex rel. Cal. Regional Wat. Quality Control Bd. v. Barry (1987) 194 Cal.App.3d 158, 172, 239 Cal.Rptr. 349.)
If the State Board grants review, its decision is subject to judicial review by means of a petition for writ of administrative mandamus filed in the superior court. (WatCode, § 13330, subd. (a).) If the State Board denies review, "the statutory scheme ... provides for direct judicial review" of the challenged Regional Water Board decision, likewise by superior court mandamus petition. (Johnson v. State Water Resources Control Bd, supra, 123 Cal.App.4th at p. 1114, 20 Cal.Rptr.3d 441; Wat.Code, § 13330, subd. (b).)

*501 III. State Law Governing Power Plant Approvals: the Warren-Alquist Act
The California statutory scheme governing power plants is entitled the Warren-Alquist State Energy Resources Conservation and Development Act. (Pub. Resources Code, § 25000.) The provisions of the Warren-Alquist Act are contained in Division 15 of the Public Resources Code, at sections 25000 et seq.

A. Overview
The Warren-Alquist Act governs the siting of "thermal powerplants" as statutorily defined. The Act includes the following relevant definitions: "`Site' means any location on which a facility is constructed or is proposed to be constructed." (Pub.Res. Code, § 25119.) "`Facility' means any electric transmission line or thermal powerplant, or both electric transmission line and thermal powerplant, regulated according to the provisions of this division." (Id., § 25110.) "`Thermal powerplant' means any stationary or floating electrical generating facility using any source of thermal energy, with a generating capacity of 50 megawatts or more, and any facilities appurtenant thereto." (Id., § 25120.) "`Modification of an existing facility' means any alteration, replacement, or improvement of equipment that results in a 50-megawatt or more increase in the electric generating capacity of an existing thermal powerplant or an increase of 25 percent in the peak operating voltage or peak kilowatt capacity of an existing electric transmission line." (Id., § 25123.)
Pursuant to the Warren-Alquist Act, the California Energy Commission has "the exclusive power to certify all sites and related facilities in the state, whether a new site and related facility or a change or addition to an existing facility. The issuance of a certificate by the commission shall be in lieu of any permit, certificate, or similar document required by any state, local or regional agency, or federal agency to the extent permitted by federal law, for such use of the site...." (Pub.Res.Code, § 25500.)
Under this statutory scheme, the "Energy Commission is the `one stop shopping' center for power plant licenses in California. It exercises the State's ultimate authority in reviewing and mitigating the environmental impacts of these plants." (5 Manaster & Selmi, Cal. Environmental Law, supra, Power Plant Siting, § 75A.01, p. 75A-4.) "As defined in the Warren-Alquist Act, the Commission's jurisdiction over power plant siting is all encompassing." (Id. at § 75A.03, p. 75A-6.)

B. Operation
The Warren-Alquist Act provides that "no construction of any facility or modification of any existing facility shall be commenced without first obtaining certification for any such site and related facility by the commission, as prescribed in this division." (Pub. Res.Code, § 25500 [referring to Division 15].)
Nominally, the first step in the administrative certification process is "a notice of intention to file an application for the certification of the site and related facility or facilities." (Pub.Res.Code, § 25502.) "The purpose of the notice of intent is to determine whether the proposed site or sites are suitable to accommodate the proposed facility, and whether the proposals comply with Energy Commission standards and demand forecasts." (58 Ops. Atty.Gen. 729, 731 (1975); id. at p. 742.) By statute, however, certain applicants are exempt from filing a notice of intention (NOI). (See Pub. Res.Code, § 25540.6.) "The NOI process has not been used for over 10 years.... At present, all projects actually being proposed in California are *502 exempt from the NOI process." (5 Manaster & Selmi, Cal. Environmental Law, supra, § 75A.04[1], p. 75A-10, fn. omitted.)
Regardless of whether a notice of intention is required, every applicant wishing to construct or modify a thermal power plant must file an Application for Certification (AFC) with the Energy Commission. (Pub.Res.Code, § 25519, subd. (a); 58 Ops. Atty.Gen. 729, 731 [1975]; 5 Manaster & Selmi, Cal. Environmental Law, supra, § 75A.04[2][a], [b], p. 75A-10 to 75A-11.) "Once the AFC is filed, it must be determined by the Commission to be `data adequate,' i.e, complete, based on informational requirements in the Commission's regulations." (5 Manaster & Selmi, Cal. Environmental Law, supra, § 75A.04[2][c], pp. 75A-11 to 75A-12; Pub. Res.Code, § 25519, subd. (b); Cal.Code Regs, tit. 20, § 1709.) "After acceptance of the AFC as `data adequate,' the Commission's staff then issues a preliminary Staff Assessment (`PSA') of the project, and the parties may file comments on the PSA." (5 Manaster & Selmi, Cal. Environmental Law, supra, § 75A.04[3][a], p. 75A-12, fn. omitted.) After staff workshops and the opportunity for public comment, the staff prepares a Final Staff Assessment (FSA). (Ibid.; Cal.Code of Regs., tit. 20, §§ 1742-1744.) By gubernatorial executive order issued in February 2001, effective through December 2001, the FSA operates as the equivalent of an environmental impact report under the California Environmental Quality Act (CEQA). (City of Morgan Hill v. Bay Area Air Quality Management Dist. (2004) 118 Cal.App.4th 861, 867, 878, 13 Cal.Rptr.3d 420; see also Pub. Res.Code, § 21080.5, subd. (a) [exemption from CEQA for certified regulatory programs].) "The order was intended to expedite the processing of applications for power plants by ensuring that the necessary environmental review of such proposals would be completed more quickly." (City of Morgan Hill v. Bay Area Air Quality Management Dist., at p. 878, 13 Cal.Rptr.3d 420.)
In addition to assessment by its own staff, the Energy Commission is required to transmit a copy of the application for certification (AFC) to various interested agencies and to elicit their comments. The statute specifically includes "local governmental agencies having land use and related jurisdiction in the area of the proposed site and related facility." (Pub.Res. Code, § 25519, subd. (f).) It also includes "each federal and state agency having jurisdiction or special interest in matters pertinent to the proposed site and related facilities and to the Attorney General." (Id., subd. (g).)
Once the staff assessment process is complete, an Energy Commission Siting Committee holds a series of public hearings. (Cal.Code of Regs, tit. 20, § 1748.) The committee then issues a proposed decision, called a Presiding Member's Proposed Decision, which is distributed for public review and comment. (Id., § 1749.) After revisions, if any, and consequent further public comment, if warranted, the proposed decision is submitted to the full Commission, which either approves the AFC with conditions or denies it. (Id., §§ 1753-1755; see generally 5 Manaster & Selmi, Cal. Environmental Law, supra, § 75A.04 [5]-[8], pp. 75A-14 to 75A-16.)
The Energy Commission may not certify a proposed facility that does not conform with applicable federal, state, regional, or local laws, unless the commission makes special findings related to public convenience and necessity. (Pub.Res.Code, § 25525.)

C. Judicial Review
The Legislature has placed explicit limitations on judicial review of certification *503 decisions of the Energy Commission, as set forth in Public Resources Code section 25531. The first limitation relates to the judicial forum, which is now the California Supreme Court alone. The Warren-Alquist Act thus provides: "The decisions of the commission on any application for certification of a site and related facility are subject to judicial review by the Supreme Court of California." (Pub.Res.Code, § 25531, subd. (a).) Previously, appellate courts could also review such decisions, but the Supreme Court has been the exclusive forum for judicial review since May 2001. (Stats.2001-2002, 1st Ex.Sess, c. 12 (S.B. 28), § 8, eff. May 22, 2001.) In that regard, the statute now mirrors an even earlier predecessor provision, which entrusted exclusive jurisdiction of Energy Commission power plant siting decisions to the Supreme Court. (County of Sonoma v. State Energy Resources Conservation etc. Com. (1985) 40 Cal.3d 361, 365-366, 220 Cal.Rptr. 114, 708 P.2d 693 ["the operative effect of section 25531 is to give this court exclusive jurisdiction over Energy Commission decisions that comprise a necessary ingredient of the certificate issued by the PUC"].)
The Legislature's intent in limiting judicial review in this fashion was to expedite the "final operative effect" of Energy Commission decisions. (County of Sonoma v. State Energy Resources Conservation etc. Com., supra, 40 Cal.3d at p. 368, 220 Cal.Rptr. 114, 708 P.2d 693.) In doing so, the Legislature "sought to expedite the state's ultimate authorization of electric generating plants...." (Id. at p. 370, 220 Cal.Rptr. 114, 708 P.2d 693.)
In addition to limiting the forum for review, Public Resources Code section 25531 expansively defines the subject matter within the Supreme Court's exclusive jurisdiction. It thus provides: "Subject to the right of judicial review of the decisions of the commission [by the Supreme Court], no court in this state has jurisdiction to hear or determine any case or controversy concerning any matter which was, or could have been, determined in a proceeding before the commission, or to stop or delay the construction or operation of any thermal powerplant except to enforce compliance with the provisions of a decision of the commission." (Pub.Res.Code, § 25531, subd. (c).)
With that statutory backdrop in mind, we turn to the parties' specific contentions, addressing them in the chronological order in which they arose below, and discussing the factual record as necessary. We begin with the question of the superior court's jurisdiction, raised below by respondents' demurrers to the petition and presented here by their cross-appeals.

ANALYSIS

I. Jurisdiction
The first issue before us is whether the superior court had subject matter jurisdiction to entertain appellant's petition for administrative mandamus. That question turns on which statute governs judicial review in this case, Porter-Cologne or Warren-Alquist.

A. The Statutes

1. The Porter-Cologne Act

As explained above, under the authority of the Porter-Cologne Act, the state's regional water boards implement the federal Clean Water Act, including its NPDES permit system. (Wat.Code § 13372; City of Burbank v. State Water Resources Control Bd., supra, 35 Cal.4th at p. 620, 26 Cal.Rptr.3d 304, 108 P.3d 862.)
Under the Act's judicial review provisions, jurisdiction is in the superior court. (Wat.Code, § 13330, subd. (b).) Porter-Cologne *504 thus provides: "Any party aggrieved by a final decision or order of a regional board for which the state board denies review may obtain review of the decision or order of the regional board in the superior court by filing in the court a petition for writ of mandate not later than 30 days from the date on which the state board denies review." (Ibid.)

2. Warren-Alquist Act
The Warren-Alquist Act governs the approval of thermal power plants, a function entrusted exclusively to the Energy Commission. (Pub.Res.Code, § 25500.)
In terms of judicial review, challenges to Energy Commission siting decisions may be heard in only one judicial forum, the California Supreme Court. (Pub.Res. Code, § 25531, subd. (a).) No other state court "has jurisdiction to hear or determine any case or controversy concerning any matter which was, or could have been, determined in a proceeding before the commission, or to stop or delay the construction or operation of any thermal powerplant except to enforce compliance with the provisions of a decision of the commission." (Id., subd. (c).)

B. Contentions
Appellant defends the trial court's decision to apply the judicial review provisions of the Porter-Cologne Act to this dispute. It argues: "The decision at issue in this litigation is not an Energy Commission decision under the Warren-Alquist Act. It * is a challenge to a National Pollutant Discharge Elimination System (`NPDES') permit issued by the [Regional Water Board], and subsequently upheld by the [State Board], pursuant to the state's federally delegated Clean Water Act program." According to appellant, "only the Water Boards are empowered to implement the delegated NPDES program in California." Appellant finds no statutory authority in the Warren-Alquist Act or elsewhere to "displace the Water Boards' exclusive jurisdiction" for this program. Additionally, appellant cites adverse policy implications that would arise from a contrary construction.
Respondents disagree. As they see it, when NPDES permits are issued in connection with power plant approvals, the Warren-Alquist Act coordinates administrative environmental review through the Energy Commission. By logical extension, judicial review is available only pursuant to the Warren-Alquist Act. In respondents' view, the disputed issue of best technology available was a "matter which was, or could have been, determined" in the Energy Commission proceeding under the statute. (Pub.Res.Code, § 25331, subd. (c).) For that reason, respondents assert, the superior court lacked subject matter jurisdiction.
As all parties recognize, the issue is one of statutory interpretation. We therefore begin our analysis by summarizing the pertinent canons of statutory construction.

C. Statutory Construction: General Principles
When charged with interpreting legislative acts, "our task is to determine afresh the intent of the Legislature by construing in context the language of the statute. In determining such intent, we begin with the language of the statute itself." (Smith v. Rae-Venter Law Group (2002) 29 Cal.4th 345, 358, 127 Cal.Rptr.2d 516, 58 P.3d 367, internal quotation marks and citations omitted.) In "giving due consideration" to statutory context, "we examine the legislative purpose in enacting the ... provision." (Id. at pp. 358-359, 127 Cal.Rptr.2d 516, 58 P.3d 367, citations omitted.) Furthermore, as our high court has repeatedly emphasized, "every statute *505 should be construed with reference to the whole system of law of which it is a part, so that all may be harmonized and have effect." (Moore v. Panish (1982) 32 Cal.3d 535, 541, 186 Cal.Rptr. 475, 652 P.2d 32.) "Where as here two codes are to be construed, they `must be regarded as blending into each other and forming a single statute.' [Citation.] Accordingly, they `must be read together and so construed as to give effect, when possible, to all the provisions thereof.'" (Tripp v. Swoap (1976) 17 Cal.3d 671, 679, 131 Cal.Rptr. 789, 552 P.2d 749, overruled on another ground in Frink v. Prod (1982) 31 Cal.3d 166, 180, 181 Cal.Rptr. 893, 643 P.2d 476.)

D. Analysis
With those principles in mind, we independently review the question of statutory construction presented here. (See, e.g., Yamaha Corp. of America v. State Bd. of Equalization (1998) 19 Cal.4th 1, 7, 78 Cal.Rptr.2d 1, 960 P.2d 1031.) In order to resolve the parties' dispute about which body of state statutory law governs judicial review of the issuance of the NPDES permitWarren-Alquist or Porter-Cologne we must consider the agencies' respective responsibilities concerning the challenged administrative determination. We begin with the Energy Commission's role.

1. The Energy Commission's Role with Respect to the Challenged Determination
The relationship between the Energy Commission and the Regional Water Board is part of a bigger picture, which entails the Energy Commission's interaction with various governmental agencies that share overlapping interests in the construction or modification of power plants. As has been said: "One who would construct and operate a California power plant must first obtain an interconnected set of federal, state and regional agency approvals." (City of Morgan Hill v. Bay Area Air Quality Management Dist., supra, 118 Cal.App.4th at p. 866, 13 Cal. Rptr.3d 420; cf., Pacific Lumber Co. v. State Water Resources Control Bd. (2006) 37 Cal.4th 921, 935, 38 Cal.Rptr.3d 220, 126 P.3d 1040 [timber harvest permit approvals are subject to a "regulatory scheme that encourages interagency teamwork" but does not strip "state agencies of their respective authority to protect resources"].)

a. Interaction with other agencies generally
As the Warren-Alquist Act recognizes, other governmental agencies may share an interest in the Energy Commission's power plant siting decision. For that reason, the Act requires the Energy Commission to inform those agencies of the application for certification. As to local governments, the Act thus provides: "Upon receipt of an application, the commission shall forward the application to local governmental agencies having land use and related jurisdiction in the area of the proposed site and related facility." (Pub.Res.Code, § 25519, subd. (f).) As to other entities, the Act requires the Energy Commission to "transmit a copy of the application to each federal and state agency having jurisdiction or special interest in matters pertinent to the proposed site and related facilities and to the Attorney General." (Id, subd.(g).) By regulation, the Energy Commission also must send the AFC "to the California Department of Fish and Game, to the Air [Pollution Control District in which the project is located, [and] to the Water Resources Control Board in which the project is located...." (Cal. Code Regs., tit. 20, § 1714, subd. (c).) The Act further provides for the timely submission of feedback: "Local and state agencies having jurisdiction or special interest *506 in matters pertinent to the proposed site and related facilities shall provide their comments and recommendations on the project within 180 days of the date of filing of an application." (Pub.Res.Code, § 25519, subd.(h); see also Cal.Code Regs., tit. 20, §§ 1714-1714.5.) The Act also requires the Energy Commission to notify interested federal agencies of its determinations: "Upon approval of an application, the commission shall forward to the United States Nuclear Regulatory Commission, the Environmental Protection Agency, and to other appropriate federal agencies, the results of its studies including the environmental impact report on the facility, the written decision on the facility contained in the application, and the commission's determination of facility safety and reliability as provided in Section 25511." (Pub.Res.Code, § 25537.)

b. Interaction with air pollution control districts
Because there are close parallels between water and air quality regulation, the Energy Commission's relationship with air pollution control districts is of particular relevance to our analysis. Before describing that relationship, we begin with some statutory background on air quality regulation.
As with the control of water pollution within California, our state's "air pollution regulatory program is based on provisions of both federal and California law." (2 Manaster & Selmi, Cal. Environmental Law, supra, § 40.02, p. 40-6.) The applicable federal law is the Clean Air Act. (42 U.S.C. § 7401 et seq.) As amended in 1990, Title V of the federal Clean Air Act operates much like the federal Clean Water Act, in that it "requires new, modified, and existing `major' and `affected' sources to obtain air pollution operating permits meeting uniform federal requirements." (2 Manaster & Selmi, Cal. Environmental Law, supra, § 40.17, p. 40-30.) That amendment reflects a determination by Congress "to emulate the NPDES program in the [Clean Air] Act's 1990 Amendments." (Ibid.) "Congress intended that the [Clean Air Act] permit program be primarily administered and enforced by state and local government permitting authorities." (Id, at p. 40-31, citing 42 U.S.C. `§§ 7661(4), 7661a(b).)
In California, the Clean Air Act is implemented by local air pollution control districts, which issue permits for the prevention of significant deterioration, called PSD permits. (City of Morgan Hill v. Bay Area Air Quality Management Dist., supra, 118 Cal.App.4th at p. 866, 13 Cal. Rptr.3d 420.) The state statute thus provides: "Every district board may establish, by regulation, a permit system that requires ... that before any person builds, erects, alters, replaces, operates, or uses any article, machine, equipment, or other contrivance which may cause the issuance of air contaminants, the person obtain a permit to do so from the air pollution control officer of the district." (Health & Saf.Code, § 42300, subd. (a).) The Environmental Protection Agency (EPA) has approved California's clean air program and delegated permitting authority to the state; the district therefore has authority to issue PSD permits pursuant to the federal Clean Air Act. (City of Morgan Hill v. Bay Area Air Quality Management Dist., at p. 871, 13 Cal.Rptr.3d 420.) The resulting authorizations are federal permits. (Ibid.)
Like other state statutory schemes aimed at environmental protection, California's clean air statutetogether with its accompanying regulationsmandates cooperation between the local air pollution control district and the state Energy Commission. "The [Energy] Commission and *507 the [Air Quality Management] District work together in their approval process. The Commission must obtain a determination of compliance from the District as part of its own air quality assessment during the certification process. The District officer reports this determination to the Commission. (Cal.Code Regs., tit. 20, § 1744.5, subd. (b); see Dist. Reg., rule 2-3-403.) A representative of the District appears at Commission hearings to present and explain that determination. (See Cal.Code Regs., tit. 20, §§ 1744.5, subd. (c), 1748.)" (City of Morgan Hill v. Bay Area Air Quality Management Dist., supra, 118 Cal.App.4th at p. 879, 13 Cal. Rptr.3d 420.)

c. Interagency coordination here
In this the Energy Commission explained in its final Commission Decision: "During the siting process, Commission staff, as well as Duke Energy carried out extensive coordination with numerous local, state, and federal agencies. These included the Central Coast Regional Water Quality Control Board (RWQCB), the Coastal Commission, the California Independent System Operator (Cal ISO), Monterey Bay National Marine Sanctuary, United States Fish and Wildlife Service, California Department of Fish and Game, U.S. Army Corps of Engineers, Monterey Bay Unified Air Pollution Control District (MBUAPCD), Pacific Gas and Electric (PG & E), Monterey County, North County Fire Protection District, and Caltrans, as well as Intervenor California Unions for Reliable Energy (CURE), and interested local environmental groups and individual citizens in the community."

2. The Regional Board's Role with Respect to the Challenged Determination
As explained above, the State Board "is designated as the state water pollution control agency for all purposes stated in the Federal Water Pollution Control Act [i.e., the Clean Water Act]." (Wat.Code, § 13160.) California implements its delegated federal permitting authority through its regional water boards. (See Wat.Code, § 13263; see also, id, §§ 13260, 13376; see generally, 2 Manaster & Selmi, Cal. Environmental Law, supra, § 30.40, p. 30-55; 57 Ops.Atty.Gen. 19, 20 (1974).)
In keeping with those statutory directives, the Regional Water Board was the agency that actually issued the challenged NPDES permit here.

3. Harmonizing the Two Agencies' Roles
When it comes to power plant siting, the Energy Commission possesses ultimate authority within the state. (City of Morgan Hill v. Bay Area Air Quality Management Dist., supra, 118 Cal.App.4th at p. 879, 13 Cal.Rptr.3d 420.) Subject only to its mandated cooperation with other agencies and compliance with applicable law, the Energy Commission's jurisdiction over power plant siting within California is "all encompassing." (5 Manaster & Selmi, Cal. Environmental Law, supra, Power Plant Siting, § 75A.03, p. 75A-6.)
"When an Energy Commission certificate is issued, it [will] supersede any conflicting local, regional or state statute, ordinance, or regulation." (58 Ops.Atty. Gen. 729, 731 [1975].) That being so, the Energy "Commission certificate constitutes the only state, local or regional approval necessary to construct and operate a power plant." (City of Morgan Hill v. Bay Area Air Quality Management District, 118 Cal.App.4th at p. 879, 13 Cal. Rptr.3d 420.) All other such approvals thus are effectively subsumed within the Energy Commission certificate. (Pub. Res.Code, § 25500 [Energy Commission's *508 certificate "shall be in lieu of any such approval "required by any state, local or regional agency"].)
The same cannot be said, however, when a necessary federal permit is at stake. One pertinent example is a PSD permit, issued by local air pollution control districts under the federal Clean Air Act for the prevention of significant deterioration of air quality. (City of Morgan Hill v. Bay Area Air Quality Management Dist., supra, 118 Cal.App.4th at p. 867, 13 Cal. Rptr.3d 420, citing 42 U.S.C. §§ 7470-7479 and 40 C.F.R. § 51.166 (2003).) A PSD permit "is a federal approval." (City of Morgan Hill, at p. 879, 13 Cal.Rptr.3d 420.) As a federal approval, the PSD permit is not necessarily subsumed within the Energy Commission's certification in the way that state, local, and regional approvals are. (Pub. Res.Code, § 25500 [Energy Commission's certificate "shall be in lieu of any federal requirement but only to "the extent permitted by federal law"].)
By parity of reasoning, the same analysis applies to federal NPDES permits, such as the one issued by the Regional Board in this case. As the Energy Commission itself observed in its final decision here: "While the Commission reviews the overall power plant project, the [Regional Board] regulates the Project's intake and discharge systems via the National Pollutant Discharge Elimination System (NPDES) permit issued pursuant to the federal Clean Water Act [citation]." A similar observation was made at the Regional Board's September 2000 meeting by its counsel. Explaining the interaction between the Energy Commission and the Regional Board, counsel said: "This board is the only agency that is authorized to issue NPDES permits in this region, under federal law. So [the Energy Commission's certification] must be consistent with the NPDES permit. It can have different things that are more stringent or different, as long as they don't conflict." In response to a board member's question, counsel explained further that the Energy Commission's proposed decision did not "act as a precedent or constraint" on the Regional Board's decision. And in its staff report for the September 2000 meeting, Regional Board staff expressed a similar view when `addressing a request by the Coastal Commission "that the Energy Commission preempt the NPDES permit...." In the stated view of the Regional Board's staff, the requested preemption "is not legal because only the State and Regional Boards have authority to implement the NPDES program in California."
In short, while the Energy Commission enjoys ultimate authority for power plant siting within California, the Regional Board is responsible for issuing any required federal NPDES permit. (Cf., National Wildlife Federation v. Consumers Power Co. (1987) 657 F.Supp. 989, 999, reversed in part on another point in National Wildlife Federation v. Consumers Power Co. (1988) 862 F.2d 580, 581 [although power plant "construction and operation ... are subject to the control of the Federal Energy Regulatory Commission, that agency's "regulatory powers over hydro-electric projects" do not "preempt any concurrent regulation under the CWA"].) Although the two agencies' approvals are interconnected, the federal permit issued by the Regional Board is not automatically subsumed within the Energy Commission's certification.

4. Implications for Judicial Review
Under the Warren-Alquist Act, judicial review of the Energy Commission's powerplant certification may be had only by direct writ review in the California Supreme Court. (Pub.Res.Code, § 25531, subd. (a); City of Morgan Hill v. *509 Bay Area Air Quality Management Dist., supra, 118 Cal.App.4th at p. 868, fn. 8, 13 Cal.Rptr.3d 420.) No other state court may hear or decide "any matter which was, or could have been, determined in a proceeding before the commission...." (Pub.Res. Code, § 25531, subd. (c).) Under the Porter-Cologne Act, by contrast, approval of the federal NPDES permit is subject to challenge by administrative mandamus in superior court. (Wat.Code, § 13330, subd. (b); [PSD permit].)
As we now explain, the judicial review provisions of the Porter-Cologne Act govern this controversy. We reach that conclusion after analyzing the subject matter of the determination, addressing the forum choices, and considering legislative intent.

a. Subject matter
As just explained, the NPDES permit issued here constitutes a separate federal approval needed for this project. As the Energy Commission itself acknowledged, the Regional Board is the agency that "regulates the Project's intake and discharge systems" by means of the NPDES permit.
We recognize that the Energy Commission in fact incorporated the requirements imposed on Duke by the Regional Board. The Energy Commission thus imposed the following as a condition of certification: "The project owner shall submit the final, approved National Pollutant Discharge Elimination System Permit from the Central Coast Regional Water Quality Control Board governing the discharge of the project's , once through cooling water to the Energy Commission. The project owner shall comply with all provisions of the National Pollutant Discharge Elimination System Permit."
But we are not persuaded that incorporation of the permit requirements somehow converts them into a "matter which was, or could have been, determined" by the Energy Commission. (Pub.Res.Code, § 25531, subd. (c).) As noted above, the Commission must follow the laws governing other affected agencies: it "may not certify a facility ... when it finds ... that the facility does not conform with any applicable state, local, or regional standards...." (Pub.Res.Code, § 25525.) And it "may not make a finding in conflict with applicable federal law or regulation." (Ibid.) Consistent with that legal constraint, the Energy Commission made the following general finding in this case: "The Conditions of Certification contained in the accompanying text, if implemented by the Applicant, ensure that the project will be designed, sited, and operated in conformity with applicable local, regional, state, and federal laws, ordinances, regulations, and standards, including applicable public health and safety standards, and air and water quality standards." Among the laws it identified as applicable was the federal Clean Water Act.
In this context, we conclude, the NPDES permit requirements do not represent a "matter which was, or could have been, determined" by the Commission. (Pub.Res.Code, § 25531, subd. (c).) To the contrary, the matter was "determined" by the Regional Board and that determination was adopted by the Energy Commission in the course of discharging its own legal obligation.

b. Forum choice
Warren-Alquist and Porter-Cologne each provide for a different judicial forum, depending on whether the challenged decision is a power plant certification.
As our high court instructs, we must read these provisions together, giving effect *510 to both provisions if we can. (Tripp v. Swoap, supra, 17 Cal.3d at p. 679, 131 Cal.Rptr. 789, 552 P.2d 749.) Honoring that instruction, we conclude that both avenues for judicial review are open to an aggrieved party in a proper case.
The petitioner thus may seek writ review of a power plant certification in the California Supreme Court, while challenging an NPDES permit in superior court at the same or another time. [Supreme Court review of Energy Commission certification]; id. at p. 869, 13 Cal.Rptr.3d 420 [superior court review of PSD permit].) Review of a challenged decision thus may be had "by filing a petition for a writ of mandate in the superior court, unless the decision is one on an application for certification of a thermal power plant, in which case the petition must be filed in the Supreme Court." (Santa Teresa Citizen Action Group v. State Energy Resources Conservation & Development Com. (2003) 105 Cal.App.4th 1441, 1446, 130 Cal. Rptr.2d 392.)
As explained above, the administrative decision challenged in this case is not the power plant certification itself; rather it is the separate NPDES permit. Appellant's challenge to that permit thus was properly heard in the superior court.

c. Legislative intent
By accepting the Legislature's decision to grant access to the superior court for a challenge under Porter-Cologne, we do no violence to the limitation on judicial forum enacted as part of Warren-Alquist. As noted above, the legislative intent behind that limitation was to hasten the "final operative effect" of Energy Commission decisions. (County of Sonoma v. State Energy Resources Conservation etc. Com., supra, 40 Cal.3d at p. 368, 220 Cal.Rptr. 114, 708 P.2d 693.) In doing so, the Legislature "sought to expedite the state's ultimate authorization of electric generating plants...." (Id. at p. 370, 220 Cal.Rptr. 114, 708 P.2d 693.)
This is not a case in which the superior court acted "to stop or delay the construction or operation of any thermal powerplant," however. (Pub.Res.Code, § 25531, subd. (c).) In its October 2002 intended decision, the court stated: "Nothing in this decision compels an interruption in the ongoing plant operation during the Regional [B]oard's review of this matter" on remand.

E. Conclusion
For all of the foregoing reasons, we conclude that the judicial review provisions of the Porter-Cologne Act govern this controversy, and that the superior court thus had jurisdiction to hear and determine the parties' dispute concerning the NPDES permit.
Having concluded that the trial court had jurisdiction to hear this controversy, we next consider the propriety of its decision to remand the matter to the Regional Board.

II. Remand Order
As noted above, the court rejected one of the Regional Board's NPDES permit findings, number 48, which addressed best technology available (BTA) for the cooling system. As the court stated in its October 2002 intended decision: "Finding number 48 is not supported by the weight of the evidence." The court therefore ordered issuance of a writ of mandate "compelling the Regional Board to conduct a thorough and comprehensive analysis of Best Technology Available applicable to the Moss Landing Power Plant." Duke *511 and the Water Boards objected to the intended decision, but the court adopted it as its statement of decision. The court directed appellant to "prepare an appropriate judgment, present it to opposing counsel for review, and submit it to this court for signature." But the parties could not agree on the form of judgment and the writ never issued. Instead, in March 2003, the court entered an order remanding the matter to the Regional Board for a hearing on the BTA issue.[3] The court retained jurisdiction while the remand was pending.
The trial court's decision to remand the matter to the Regional Board is challenged by both sides. In the appeal, appellant contends that the remand procedure violates the statute governing administrative mandamus and thus was fatally flawed. In the cross-appeal, respondents argue that the court should not have remanded the matter, because ample evidence supported the original administrative approvals.
We consider each side's challenge to the remand in turn, ultimately rejecting both. Addressing appellant's challenge first, we conclude that the remand was procedurally proper, both as a matter of statutory authority and as an exercise of the trial court's inherent powers. Reaching respondents' contention next, we find substantial evidence to support the trial court's evidentiary determination.

A. Procedural Propriety of the Remand Order
According to appellant, remand was foreclosed by Code of Civil Procedure section 1094.5. which governs administrative mandamus actions. As appellant reads that statute, only two remedies were available to the trial court: (1) issuance of a writ commanding the Regional Board to set aside its entire order, or (2) a judgment denying the petition for writ of mandamus. (See Code Civ. Proc., § 1094.5, subd. (f).)
Respondents disagree. The Water Boards contend: "There is nothing in Code of Civil Procedure section 1094.5(f) prohibiting the action of the trial court to order the remand, then issue the judgment denying the writ" at a later time. They observe: "In this case a judgment was ultimately issued denying the writ, as required by the section." For its part, instead of focusing on the statute, Duke argues that the court had inherent authority to remand to the Regional Board.
Moreover, Duke asserts, appellant's claims have been rendered moot by the subsequent proceedings. Appellant disputes Duke's assertion of mootness. We consider that issue at the threshold.

1. Mootness
As Duke aptly observes: "A question may be deemed moot when, although it initially presented an existing controversy, the passage of time or the acts of the parties or a court decision have deprived the controversy of its life." (Boccato v. City of Hermosa Beach (1984) 158 Cal. App.3d 804. 808, 204 Cal.Rptr. 727.)
Here, however, we conclude that the parties' dispute over the procedural propriety of interlocutory remand retains vitality. Appellant's claims on this point relate to the manner in which the subsequent *512 proceedings were conducted. Specifically, appellant contends, a writ should have issued setting aside the entire NPDES permit. Instead, more limited proceedings were conductedover appellant's continuing objections. Thus, this is not a case where the appellant's own conduct rendered its challenge moot. (Cf., MHC Operating Limited Partnership v. City of San Jose (2003) 106 Cal.App.4th 204, 214, 130 Cal.Rptr.2d 564 [City's appeal was moot where it complied with writ of mandate].) Nor is this a case in which actions by another party to the litigation deprived the controversy of life. (Cf., Boccato v. City of Hermosa Beach, supra, 158 Cal.App.3d at p. 808, 204 Cal.Rptr. 727 [plaintiffs challenge to parking permit fees was moot because defendant refunded the fees].) Finally, we cannot agree that appellant's unsatisfied demand for a different and fuller administrative process is rendered moot simply because the challenged proceedings were undertaken and completed. (Cf., Terry v. Civil Service Commission (1952) 108 Cal.App.2d 861, 871-872, 240 P.2d 691 [mandamus proceedings to enforce petitioners' right to take civil service examination were not rendered moot by their failure to pass it].) For that reason, we conclude, appellant's claims of procedural error are not moot.
In any event, even if appellant's claims were technically moot, we have inherent power to decide them, since the issues presented are important and of continuing interest. (Burch v. George (1994) 7 Cal.4th 246, 253, fn. 4, 27 Cal.Rptr.2d 165, 866 P.2d 92; Morehart v. County of Santa Barbara (1994) 7 Cal.4th 725, 746-747, 29 Cal.Rptr.2d 804, 872 P.2d 143; City of Morgan Hill v. Brown (1999) 71 Cal. App.4th 1114, 1121, fn. 5, 84 Cal.Rptr.2d 361.) We therefore consider the substance of appellant's contentions.

2. Authority to Remand under Code of Civil Procedure section 1094. 5
On the merits, our analysis of the question of the remand's procedural propriety begins with the governing statute. Our standard of review is de novo. (Usher v. County of Monterey (1998) 65 Cal.App.4th 210, 216, 76 Cal.Rptr.2d 274.)

a. The statute
The pertinent statutory provision is Code of Civil Procedure section 1094.5, which governs administrative mandamus actions in superior court. Of particular relevance here is subdivision (f), which reads in pertinent part: "The court, shall enter judgment either commanding respondent to set aside the order or decision, or denying the writ. Where the judgment commands that the order or decision be set aside, it may order the reconsideration of the case in the light of the court's opinion and judgment...." (Code Civ. Proc., § 1094.5, subd. (f).)
According to appellant, the remand order issued here is an impermissible interlocutory judgment, which is not authorized by the statute.

b. Case law
In support of its argument, appellant relies on Resource Defense Fund v. Local Agency Formation Com. (1987) 191 Cal. App.3d 886, 236 Cal.Rptr. 794. In that case, the plaintiffs challenged a city's annexation action, petitioning for a writ of administrative mandamus. (Id. at pp. 890, 899, 236 Cal.Rptr. 794.) The trial court found the city's environmental findings inadequate under the California Environmental Quality Act (CEQA). (Id. at p. 899, 236 Cal.Rptr. 794.) It entered an interlocutory judgment of remand, to allow the city to make the necessary findings; the order provided for "judgment to be entered after action by the city council or *513 the expiration of 60 days." (Ibid.) On appeal, the First District Court of Appeal concluded that "the interlocutory remand was improper." (Ibid.) The appellate court cited two grounds. First, it explained: "We cannot agree that an interlocutory judgment is authorized by Code of Civil Procedure section 1094.5. That statute authorizes remand when the writ is granted: `Where the judgment commands that the order or decision be set aside, it may order the reconsideration of the case in the light of the court's opinion and judgment and may order respondent to take such further action as is specially enjoined upon it by law....' (Code Civ. Proc., § 1094.5, subd. (f).) In proper context, the questioned remand is not a prejudgment procedure." (Ibid., italics omitted.) "Moreover," the court continued, "we think the use of an interlocutory remand raises serious questions of due process: it effectively precluded any possible challenge to the sufficiency of the evidence to support the new findings." (Id. at p. 900, 236 Cal.Rptr. 794.) In the court's words: "The misguided attempt to salvage the defective proceedings provided no opportunity to test the adequacy of the new findings or otherwise challenge the existence of supporting evidence and compliance with the CEQA." (Ibid.) "In this respect alone, we find the interlocutory judgment grievously erroneous." (Ibid.)
Thereafter, the same court revisited Resource Defense. Fund, in Sierra Club v. Contra Costa County (1992) 10 Cal. App.4th 1212, 13 Cal.Rptr.2d 182. The court described both the statutory and due process components of its earlier decision, framing two similar arguments in its current case. (Id at pp. 1220-1222, 13 Cal. Rptr.2d 182.) First addressing the statutory basis of its earlier decision, the court noted its conclusion in Resource Defense Fund "that Code of Civil Procedure section 1094.5 does not permit remand before the writ issues, but instead specifies that the writ shall issue and the reviewing court may then remand." (Sierra Club, at pp. 1220-1221, 13 Cal.Rptr.2d 182.) A different statute was at issue in Sierra Club, a CEQA provision that "directs a court which finds a public agency has failed to act in compliance with CEQA to issue a writ of mandate." (Id, at p. 1218, 13 Cal. Rptr.2d 182, fn. omitted, citing Pub. Res. Code, § 21168.9.) A different trial court procedure also was employed in Sierra Club: "the trial court did not proceed by way of interlocutory judgment and remand, but instead issued a tentative decision directing adoption of additional findings." (Id. at p. 1221, 13 Cal.Rptr.2d 182.) The court in Sierra Club implicitly concluded that the trial court's failure to issue a writ before remanding to the agency did not comport with the express requirements of the governing CEQA provision. (Id. at p. 1221, 13 Cal.Rptr.2d 182.) The court next focused on the due process element of the Resource Defense Fund case, observing: "The vice of prejudgment remand, as Resource Defense Fund points out, is that it `raises serious questions of due process....'" (Ibid., quoting Resource Defense Fund v. Local Agency Formation Com., supra, 191 Cal.App.3d at p. 900, 236 Cal.Rptr. 794.) The procedure at issue in Sierra Club produced the same due process flaws identified in Resource Defense Fund. As the Sierra Club court explained: "The result of that procedure has been effectively to insulate those findings from any meaningful challenge." (Sierra Club, at p. 1221, 13 Cal.Rptr.2d 182.) The court therefore concluded that the trial court "erred by not issuing the writ of mandate and remanding the EIR to the Board." (Id. at p. 1222,13 Cal.Rptr.2d 182.)
As respondents point out, however, other authorities have endorsed the general *514 use of administrative remand in a proper case.
In one category of cases, remand is permitted to correct procedural defects at the administrative level. Such a defect exists, for example, where there has been no fair hearing. In the words of our state's high court, "it is established that the proper procedure upon the failure of an administrative board to give a hearing under appropriate circumstances, is to remand the case to the board for proper proceedings." (Steen v. City of Los Angeles (1948) 31 Cal.2d 542, 546, 190 P.2d 937; see also, e.g., English v. City of Long Beach (1950) 35 Cal.2d 155, 159-160, 217 P.2d 22; Clark v. City of Hermosa Beach (1996) 48 Cal. App.4th 1152, 1174, 56 Cal.Rptr.2d 223.) A second example of using remand to correct a procedural defect is when the evidentiary record of the administrative hearing is inadequate. (See Aluisi v. County of Fresno (1958) 159 Cal.App.2d 823, 828, 324 P.2d 920; but see id. at p. 826, 324 P.2d 920 [writ issued].) "Moreover, the Supreme Court has held that the trial court has the power to remand a matter to an administrative agency for clarification of ambiguous findings." (Rapid Transit Advocates, Inc. v. Southern Cal. Rapid Transit Dist. (1986) 185 Cal.App.3d 996, 1003, 230 Cal.Rptr. 225, citing No Oil, Inc. v. City of Los Angeles (1974) 13 Cal.3d 68, 81, 118 Cal.Rptr. 34, 529 P.2d 66, and Keeler v. Superior Court (1956) 46 Cal.2d 596, 600, 297 P.2d 967; cf., National Association of Home Builders v. Defenders of Wildlife, supra, 127 S.Ct. at p. 2529 ["proper course would have been to remand to the agency for clarification of its reasons"].) And when "there are errors in the admission of evidence before an administrative agency, it is proper to remand to the agency for reconsideration." (Newman v. State Personnel Board (1992) 10 Cal.App.4th 41, 49, 12 Cal.Rptr.2d 601.) "Remand for reconsideration is also appropriate where the original hearing before the agency was conducted by an unauthorized hearing officer." (Ibid.; see also, e.g., Usher v. County of Monterey, supra, 65 Cal.App.4th at p. 219, 76 Cal.Rptr.2d 274.) But where "the administrative agency errs not in the conduct of the hearing but in the results reached, there is no basis for reconsideration." (Newman v. State Personnel Bd., at p. 49, 12 Cal. Rptr.2d 601.)
Remand is allowed in a second category of cases, where relevant new evidence is to be considered. (Code Civ. Proc., § 1094.5, subd. (e).)[4] In such cases, the statute "specifically authorizes remand proceedings." (Rapid Transit Advocates, Inc. v. Southern Cal. Rapid Transit Dist., supra, 185 Cal.App.3d at p. 1003, 230 Cal.Rptr. 225.) "Code of Civil Procedure section 1094.5, subdivision (e), ... permits consideration of relevant evidence that either was improperly excluded by the administrative agency or could not with reasonable diligence be produced before it." (Helene Curtis, Inc. v. Los Angeles County Assessment Appeals Bds. (2004) 121 Cal.App.4th 29, 37, 16 Cal.Rptr.3d 658; Ashford v. Culver City Unified School Dist. (2005) 130 Cal.App.4th 344, 350, 29 Cal.Rptr.3d 728.) "Subdivision (e) opens a narrow, discretionary window for additional evidence, newly discovered after the hearing *515 (or improperly excluded at it). Routine allowance thereunder of conflicting scientific opinions created after the decision would pose for quasi-judicial decisions ... a threat of repeated rounds of litigation, and uncertain, attenuated finality...." (Fort Mojave Indian Tribe v. Department of Health Services (1995) 38 Cal.App.4th 1574, 1595, 45 Cal.Rptr.2d 822.) "Remand under Code of Civil Procedure section 1094.5, subdivision (e) for consideration of postdecision evidence generally has been limited to truly new evidence, of emergent facts." (Ibid.; see generally, 2 Cal.Jur. (3d ed. 2007) Administrative Law, § 804, pp. 290-291.)
The cases thus recognize the propriety of remand where procedural defects have prevented a fair administrative hearing or where relevant new evidence has emerged. As our high court long ago observed in the context of administrative mandamus actions, "where determinative powers are vested in a local administrative agency and the court finds its decision lacks evidentiary basis, a hearing was denied or it was otherwise erroneous, it is proper procedure to remand the matter to the agency for further and proper proceedings rather than for the court to decide the matter on the merits." (Fascination, Inc. v. Hoover (1952) 39 Cal.2d 260, 268, 246 P.2d 656.) "If a hearing has been denied or the evidence is insufficient to sustain the action of the board, and it is still possible for the board to hold a hearing or exercise its discretion, then the matter should be remanded to the board for further consideration rather than having a trial de novo in the superior court and requiring that court to exercise independent judgment on the facts which should be determined by the board." (La Prade v. Department of Water & Power (1945) 27 Cal.2d 47, 53, 162 P.2d 13.)

c. Analysis
The question before us is whether the statute categorically forbids a limited interlocutory remand to the agency without issuance of a writ, as appellant contends. We conclude that it does not. Based on the language of Code of Civil Procedure section 1094.5, subdivision (f), and considering the foregoing authority, particularly the cases from the California Supreme Court, we reject appellant's interpretation of the statute. We acknowledge that there is an apparent split of authority on the question. As one commentator notes, "it is unclear whether the remand procedure . . . may be used without entry of judgment or issuance of a writ." (2 Cal. Administrative Mandamus (2007) Trial and Judgment, § 14.28, p. 537, citation omitted; see also, id. § 14.29, p. 538.)
As we now explain, we conclude that the statute permits such a procedure in a proper case. We reach that conclusion after examining the statute's use of the word "judgment," the necessity for a writ, and the validity of a limited remand. As relevant to our analysis here, the statutory language reads: "The court shall enter judgment either commanding respondent to set aside the order or decision, or denying the writ." (Code Civ. Proc., § 1094.5, subd.(f).)
Judgment: The statute requires the court to "enter judgment...." (Code Civ. Proc., § 1094.5, subd. (f).) Generally speaking, judgment means "the final determination of the rights of the parties in an action or proceeding." (Code Civ. Proc., § 577; Griset v. Fair Political Practices Com. (2001) 25 Cal.4th 688, 697, 107 Cal.Rptr.2d 149, 23 P.3d 43.) Likewise, by general statutory definition, a "judgment in a special proceeding is the final determination of the rights of the parties therein." (Code Civ. Proc., *516 § 1064.) As our state's high court long ago recognized: "There can be but one `final judgment' in an action, and that is the one which in effect ends the suit in the court in which it was instituted and finally determines the rights of the parties in relation to the matter in controversy." (Stockton etc. Works v. Ins. Co. (1893) 98 Cal. 557, 577, 33 P. 633.) But the "label of the judgment as `interlocutory' is not determinative upon this question, since it is the substance and effect of a judgment that determines its finality." (In re L.A. County Pioneer Society (1953) 40 Cal.2d 852, 857-858, 257 P.2d 1.) A judgment is not final where the "court expressly reserved] for future decision questions regarding the rights, duties, and liabilities of the parties." (Id. at p. 858, 257 P.2d 1.) This is equally true in the context of special proceedings such as mandamus. Thus, for example, there is no final judgment where "the trial court's denial of the alternative writ in administrative mandamus neither terminated the proceeding below nor finally determined the rights of the parties in the proceeding." (Gibson v. Savings & Loan Commissioner (1970) 6 Cal.App.3d 269, 272, 85 Cal.Rptr. 799; accord, Covina-Azusa Fire Fighters Union v. City of Azusa (1978) 81 Cal.App.3d 48, 56,146 Cal.Rptr. 155.)
Here, the statute plainly contemplates entry of a final judgment at the conclusion of the mandate proceeding. But we find nothing in the language of Code of Civil Procedure, section 1094.5, subdivision (f), that forecloses the use of an interlocutory order, either expressly or by necessary implication. (See Ng v. State Personnel Bd. (1977) 68 Cal.App.3d 600, 604, 137 Cal.Rptr. 387 [court's remand was an interlocutory order, not a final, appealable judgment]; County of Inyo v. City of Los Angeles (1978) 78 Cal.App.3d 82, 85, 144 Cal.Rptr. 71 [appellate court's earlier decision in mandamus proceeding "was an interim one which did not terminate the lawsuit"]; Endangered Habitats League, Inc. v. State Water Resources Control Bd. (1997) 63 Cal.App.4th 227, 243, 73 Cal. Rptr.2d 388 [same]; see also, e.g., Rapid Transit Advocates, Inc. v. Southern Cal. Rapid Transit Dist., supra, 185 Cal. App.3d at p. 1003, 230 Cal.Rptr. 225 [trial court acted properly in continuing mandamus trial and remanding to agency for clarification of findings].)
We therefore conclude that the statute does not expressly require entry of a final judgment as a necessary predicate to remand, where further action both by the agency and by the court is contemplated.
Writ: Next, we consider the related question of whether the statute demands issuance of a peremptory writ prior to remand. Appellant argues that a writ is required at this juncture, citing the statutory language commanding the court to "enter judgment" either denying the writ or ordering the agency "to set aside the order or decision...." (Code Civ. Proc., § 1094.5, subd. (f).) We cannot agree that the statutory language demands issuance of a writ as the sole means to compel agency action while the mandamus proceeding remains pending in court.
We begin by observing that Code of Civil Procedure section 1094.5, subdivision (f), does not explicitly mention the issuance of a writ; it calls for entry of a "judgment." A writ is not a judgment. (Endangered Habitats League, Inc. v. State Water Resources Control Bd., supra, 63 Cal.App.4th at p. 244, 73 Cal.Rptr.2d 388.) By statutory definition, a writ is a species of order. "Every direction of a court or judge, made or entered in writing, and not included in a judgment, is denominated an order." (Code Civ. Proc., § 1003.) "The word "writ' signifies an order or precept in writing, issued in the name of the people, *517 or of a court or judicial officer...." (Code Civ. Proc., § 17, subd. (6); cf., Palma v. U.S. Industrial Fasteners, Inc. (1984) 36 Cal.3d 171, 176, 203 Cal.Rptr. 626, 681 P.2d 893 [form by which peremptory writ issued from the court of appeal "combined elements of both an order and a writ"].) "A writ of mandate is a piece of paper. If its purpose is to declare the rights of parties, its existence suffices.... If its purpose is to compel someone to do something, its existence does not suffice." (Endangered Habitats League, Inc. v. State Water Resources Control Bd., supra, 63 Cal.App.4th at p. 244, 73 Cal.Rptr.2d 388 [compliance is Secured via return].)
Certainly, the usual practice in mandamus proceedings is for the court to issue a writ to explain its decision and to order the agency to comply with it. (2 Cal. Administrative Mandamus, supra, Procedures After Trial, § 15.22, p. 568.) Under that familiar procedure, "the proper way to ensure compliance is to require a return on the writ, which commands a party to do something and report to the court that the act has been done." (Endangered Habitats League, Inc. v. State Water Resources Control Bd., supra, 63 Cal.App.4th at p. 244, 73 Cal.Rptr.2d 388.)
Notwithstanding that accepted general practice, we cannot agree with appellant that issuance of a writ is the only authorized procedure for accomplishing the goal of agency compliance with judicial orders. Here, the trial court instead chose to issue an order for remand, to reserve jurisdiction, and to require the agency to inform it upon the completion of remand proceedings. We find nothing in the statute that forbids use of the alternate procedure chosen by the court, while the mandate proceeding is still pending and before entry of final judgment. While the peremptory writ offers one familiar, well-accepted way for the court to secure the agency's compliance, the statute does not demand its exclusive use for this purpose. To hold otherwise would exalt form over substance. (Cf., Giannini Controls Corp. v. Superior Court (1966) 240 Cal.App.2d 142, 151, 49 Cal.Rptr. 643 [directing trial court to permit petitioners to file a "supplemental petition" in mandamus so that they would not be compelled to "relitigate the same question under a different case number"].)
Limited, Remand: Finally, we consider the statute's mandate that the court either "set aside the order or decision" or deny the writ. (Code Civ. Proc., § 1094.5, subd. (f).) Appellant apparently reads that language as a requirement that the court set aside the entire decision of the Regional Board before remanding to that agency. Appellant thus argues that the only permissible judicial remedy was "a writ of mandate ordering respondents to set aside the NPDES permit." We disagree. We find nothing in the statutory language compelling the all-or-nothing approach espoused by appellant. To the contrary, it is permissible for a court to direct "issuance of a limited writ of mandate" in an administrative mandamus proceeding. (Helene Curtis, Inc. v. Los Angeles County Assessment Appeals Bds., supra, 121 Cal.App.4th at p. 33, 16 Cal.Rptr.3d 658; id. at p. 42, 16 Cal.Rptr.3d 658 [respondent tax agency was ordered only to hold a hearing on petitioner's application to reduce its assessed valuation]; cf., Evans v. Department of Motor Vehicles (1994) 21 Cal. App.4th 958, 976, 26 Cal.Rptr.2d 460 [in proceedings under the Administrative Procedures Act, the agency itself may order an administrative reconsideration of only "part of the case" pursuant to Gov.Code, § 11521 J.) Thus, for example, where disciplinary proceedings against a liquor licensee were based on two counts, only one of which was supported by the evidence, "the matter should be remanded to the board" *518 to reconsider the penalty alone. (Stoumen v. Reilly (1951) 37 Cal.2d 713, 717, 234 P.2d 969; see also, e.g., Cooper v. State Bd. of Medical Examiners (1950) 35 Cal.2d 242, 252, 217 P.2d 630 [same].) Similarly, where only two of six disciplinary charges against a civil service employee were supported by the evidence, limited remand was proper to reconsider just the penalty. (Nelson v. Department of Corrections (1952) 110 Cal.App.2d 331, 334, 242 P.2d 906 [rejecting the petitioner's contention "that respondent Personnel Board should be required to hold an entirely new hearing"].)
By analogy, in cases involving the California Environmental Quality Act, authority for limited remand is explicitly recognized. "Public Resources .Code section 21168.9, subdivision (b), ... provides that the court's order must include only those mandates that are necessary to achieve CEQA compliance." (City of Redlands v. County of San Bernardino (2002) 96 Cal. App.4th 398, 416, 117 Cal.Rptr.2d 582, fn. omitted.) "That section provides alternative remedies which allow the trial court to tailor the remedy to fit the violation." (San Bernardino Valley Audubon Society v. Metropolitan Water Dist. (2001) 89 Cal. App.4th 1097, 1102, 109 Cal.Rptr.2d 108, fn. omitted.) "Public Resources Code section 21168.9 is a specific application of the general rule contained in Code of Civil Procedure section 1094.5, subdivision (f)...." (Id. at p. 1103, 109 Cal.Rptr.2d 108, italics added.) It "was enacted in 1984 to give the trial courts some flexibility in tailoring a remedy to fit a specific CEQA violation." (Ibid.; see also, e.g., Anderson First Coalition v. City of Anderson (2005) 130 Cal.App.4th 1173, 1181, 30 Cal.Rptr.3d 738.) The foregoing authority thus reflects the severable nature of some administrative decisions made in CEQA cases. (See generally, 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 860, pp. 1029-1030; id. (2007 supp.) pp. 78-79.)
Here, the trial court effectively ordered the agency to set aside a discrete and segregable part of its decision, finding number 48, and it ordered the Regional Board "to conduct a thorough and comprehensive analysis" with respect to that finding alone. The effect of that order was "to remand the case to the board for proper proceedings" as to that single issue. (Steen v. City of Los Angeles, supra, 31 Cal.2d at p. 546,190 P.2d 937.)
In our view, under the circumstances presented here, the trial court was justified in taking that approach. Limited remand is appropriate in this case, for several reasons: the administrative order as a whole was broad ranging and complex, covering far more than just technology alternatives for minimizing entrainment; the permit was the product of years of scientific study and interagency collaboration; and the trial court found fault with only one of the agency's 58 findings.[5]
In sum, we conclude, given the circumstances presented in this case, the court acted within the permissible confines of the statute in ordering a limited remand to the Regional Board without first commanding a writ to issue.

3. Inherent Authority to Remand
As just explained, we find nothing in Code of Civil Procedure section 1094.5 *519 that forecloses the possibility of interim remand. Moreover, the court also has the inherent authority to return a matter to an administrative agency for further proceedings. "Courts have inherent power, as well as power under section 187 of the Code of Civil Procedure, to adopt any suitable method of practice, both in ordinary actions and special proceedings, if the procedure is not specified by statute or by rules adopted by the Judicial Council." (Tide Water Assoc. Oil Co. v. Superior Court (1955) 43 Cal.2d 815, 825, 279 P.2d 35, fn. omitted [trial court did not err in trying cross-complaint with prohibition proceeding].)
As the California Supreme Court long ago recognizedalbeit in a case where section 1094.5 was found inapplicable "aside from statutory provisions, such a power to remand also exists under the inherent powers of the court." (Keeler v. Superior Court, supra, 46 Cal.2d at p. 600, 297 P.2d 967.) "There is no question but that, consistent with proper regulations, a court has inherent power to control the course of litigation before it. [Citations.] This includes the power to remand a cause in mandamus for further proceedings which are deemed necessary for a proper determination." (Ibid.) "The policy underlying such a rule is that the determination of the issues should first be made by the administrative agency." (Steen v. City of Los Angeles, supra, 31 Cal.2d at p. 546, 190 P.2d 937.)

4. Due Process
We recognize that remand without issuance of a writ may offend due process in some circumstances. As has been aptly stated: "The vice of prejudgment remand ... is that it `raises serious questions of due process: it effectively preclude[s] any possible challenge to the sufficiency of the evidence to support the new findings.'" (Sierra Club v. Contra Costa County, supra, 10 Cal.App.4th at p. 1221, 13 Cal. Rptr.2d 182, quoting Resource Defense Fund v. Local Agency Formation Com., supra, 191 Cal.App.3d at p. 900, 236 Cal. Rptr. 794.)
That is not our case, however. Here, appellant had the opportunity both to participate in the supplemental administrative hearing in 2003 and to contest the resulting findings at the continued judicial hearing in 2004. "The essential requirements of due process are met when the administrative body is required to determine the existence or nonexistence of the necessary facts before any decision is made [citations] and the party is afforded an opportunity for review by the courts [citation]." (De Cordoba v. Governing Board (1977) 71 Cal.App.3d 155, 159, 139 Cal.Rptr. 312.) "In the instant case petitioner was . .. given a full administrative hearing and afforded an opportunity for judicial review. Thus [its] constitutional right to due process was not violated." (Ibid.) In no way were the agency's procedures or findings insulated from review here. We therefore discern no due process problem arising from the prejudgment remand procedure used in this case.

5. Conclusion
Under the circumstances presented here, the court acted properly in remanding the matter to the Regional Board for additional hearings on finding number 48 only: the remand procedure comported with the requirements of Code of Civil Procedure section 1094.5; it was within the court's inherent authority; and it did not offend due process.

B. Evidentiary Predicate for Remand
In their cross-appeal, respondents question the evidentiary predicate for remand. *520 They assert that the court erred in remanding the matter to the Regional Board, because the original administrative determination was supported by substantial evidence. Appellant disagrees.
As before, our analysis begins with the statute.

1. Statutory Framework
In administrative mandamus proceedings, the judicial inquiry "shall extend to the questions whether the respondent [agency] has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings, are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b).)
In this case, the first phase of the judicial proceeding concluded with administrative remand, based on the trial court's determinationchallenged here in respondents' cross-appealthat one critical agency finding was not supported by the weight of the evidence.
As a necessary threshold step in assessing the challenged determination, we first describe the governing standards of review.

2. Standard of Review in the Trial Court: Independent Judgment
In this case, the Porter-Cologne Act provides for independent trial court review of the evidence before the Regional Board as contained in the administrative record: "For the purposes of subdivision (c) of Section 1094.5 of the Code of Civil Procedure, the court shall exercise its independent judgment on the evidence...." (Wat.Code, § 13330, subd. (d).)
Independent trial court review is accomplished "by means of a limited trial de novo in which the trial court not only examines the record for errors of law but also exercises its independent judgment upon the weight of the evidence produced before the administrative agency together with any further evidence properly admitted by the court." (Merrill v. Department of Motor Vehicles (1969) 71 Cal.2d 907, 914, 80 Cal.Rptr. 89, 458 P.2d 33, fns. omitted.) However, "judicial trial de novo after an administrative hearing is not usually intended as a trial without appropriate consideration of the evidence upon which the administrative body based its action." (Dare v. Bd. of Medical Examiners (1943) 21 Cal.2d 790, 801, 136 P.2d 304.) "In exercising its independent judgment, a trial court must afford a strong presumption of correctness concerning the administrative findings, and the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (Fukuda v. City of Angels (1999) 20 Cal.4th 805, 817, 85 Cal.Rptr.2d 696, 977 P.2d 693; see generally, 1 Cal. Administrative Mandamus, supra, Court's Scope of Review Under CCP § 1094.5, § 6.163, pp. 294-295.)

3. Standard of Review in the Appellate Court: Substantial Evidence
Where an independent review standard applies below, as is the case here, we review the factual findings of the trial court, not those of the agency. (Fukuda v. City of Angels, supra, 20 Cal.4th at p. 824, 85 Cal.Rptr.2d 696, 977 P.2d 693.) Thus, "where the trial court exercised its independent judgment, we must determine "whether the findings and judgment of the trial court are supported by substantial, credible and competent evidence.' [Citation.] *521 All conflicts in the evidence must be resolved and all inferences drawn in favor of the judgment." (Cooper v. Kizer (1991) 230 Cal.App.3d 1291, 1299, 282 Cal.Rptr. 492, quoting Evans v. Unemployment Ins. Appeals Bd. (1985) 39 Cal.3d 398, 407, 216 Cal.Rptr. 782, 703 P.2d 122; see also, e.g., Lake v. Reed (1997) 16 Cal.4th 448, 456, 65 Cal.Rptr.2d 860, 940 P.2d 311.) In other words, where "the trial court is authorized to conduct a limited trial de novo ... the province of the appellate court is analogous to that assumed by it in an ordinary civil appeal...." (Merrill v. Department of Motor Vehicles, supra, 71 Cal.2d at p. 915, 80 Cal.Rptr. 89, 458 P.2d 33; accord, State Water Resources Control Bd. Cases (2006) 136 Cal.App.4th 674, 721, 39 Cal.Rptr.3d 189.)

4. The Evidence
With that deferential review standard in mind, we now assess the trial court's decision to remand the matter to the Regional Board "to conduct a thorough and comprehensive analysis of Best Technology Available," a decision that was based on its determination that finding number 48 lacked evidentiary support in the administrative record. Our assessment of this point turns on these two questions: Is there is evidence of alternatives to once-through cooling in the administrative record? If so, is there evidence that the Regional Board considered such alternatives?

a. Background: alternatives for plant cooling
"Thermal electric generating facilities create heat in order to convert water into high-pressure steam that will drive turbines, thus generating electricity." (Rábago, What Comes Out Must Go In: Cooling Water Intakes and the Clean Water Act (1992) 16 Harv. Envtl. L.Rev. 429, 438.) Power plants need a thermal transfer system to eliminate the excess heat that they produce. (Ibid.; see also, May & van Rossum, The Quick and the Dead: Fish Entrainment, Entrapment, and the Implementation and Application of Section 316(b) of the Clean Water Act (1995) 20 Vt. L.Rev. 373, 376.) Waste heat is eliminated using air (dry cooling) or water (wet cooling). Wet cooling systems may be broadly categorized as either open cycle (once-through) or closed cycle.
Dry Cooling: Dry cooling systems employ air-cooled condensers, fans, and large cooling towers. They use virtually no water. (Riverkeeper, Inc. v. United States Environmental Protection Agency (2007) 475 F.3d 83, 91, fn. 3 (Riverkeeper II).)
Once-Through Wet Cooling: "A once-through cooling system withdraws water from the source waterbody, runs it through the condenser system, and then discharges without recirculation. As the water circulates through the condenser system it is heated, and thus returns to the environment in a heated state. Once-through cooling systems require a continual supply of cooling water and are more common than closed-cycle systems." (May & van Rossum, supra, 20 Vt. L.Rev. at p. 379; see also Riverkeeper II, supra, 475 F.3d at p. 91, fn. 3; Rábago, supra, 16 Harv. Envtl. L.Rev. at p. 430.) Once-through cooling was already in use at the Moss Landing Power Plant, and the Regional Water Board approved that alternative as the best technology available for the two new units at the plant.
Closed-Cycle Wet Cooling: "In contrast to once-through cooling systems, closed-cycle cooling systems recirculate and reuse cooling water. As with once-through cooling, cooling water in closed-cycle systems is passed through the condenser system where it is heated in the process of converting steam back to water. After passing *522 through the condenser system, however, the cooling water is transported to cooling towers or to some other process to be cooled. Once cooled, the water is returned to the condenser system and used again in the cooling process. Although the cooling water used in a closed-cycle system is constantly being reused and recycled, some of the water is lost through evaporation and other processes. Therefore closed-cycle systems must recoup such losses by making additional withdrawals of cooling water from the source waterbody. The amount of make-up cooling water withdrawn from the source waterbody in a closed-cycle system is only 2% to 4% of the quantity of water used by a comparable once-through system. Accordingly, the adverse environmental impact on aquatic ecosystems is far less from closed-cycle than from once-through systems." (May & van Rossum, supra, 20 Vt. L.Rev. at pp. 379-380; see also Riverkeeper II, supra, 475 F.3d at p. 91, fn. 3; Rábago, supra, 16 Harv. Envtl. L.Rev. at p. 430.) Closed cycle wet cooling systems may employ either mechanical or natural draft cooling towers, using either fresh water or seawater.
Water Intake: Wet cooling systems both once-through and closed cycledepend on water intake from a source waterbody. Technology alternatives exist for water flow reductions, which in turn diminish impact on aquatic organisms. They include water pump flow reduction and seasonal flow reduction. Apart from technologies that limit intake flow, there are other technologies for minimizing biological impacts, such as screens and filters; physical and behavioral barriers; and fish collection, removal, and conveyance systems. (See generally, May & van Rossum, supra, 20 Vt. L.Rev. at pp. 455-459, 465.) Beyond design alternatives, intake location may be changed, either to an alternate onshore site or to an offshore location. (Id. at pp. 459-63.)

b. Discussion of alternatives in the administrative record
In their briefs on appeal, respondents cite to numerous documents in the administrative record that discuss alternatives for the plant's cooling water intake system. The Water Boards first point to reports and analyses presented to the Energy Commission, including: Duke's application for certification, made in May 1999; Duke's responses to the Energy Commission's request for supplemental data, dated July 1999; the Energy Commission staffs preliminary, final, and amended analyses, which were submitted between February and June 2000; and the Energy Commission's Presiding Member's Proposed Decision, issued in August 2000. They also emphasize the existence of reports prepared or evaluated by the Technical Working Group (TWG), including studies submitted by Duke as required by the Regional Board.[6] Lastly, the Water Boards list various reports, comments, and presentations submitted to the Regional Water Board at its meetings in September and October 2000.
Only that last category of evidence concerns us here. Whatever information exists in the administrative record as a whole, the focus of judicial inquiry properly rests solely on the evidence before the *523 Regional Board, which was the agency charged with approving or disapproving the NPDES permit. We consider that evidence now.

c. Evidence of alternatives presented to the Regional Board
Duke's NPDES permit application was considered by the Regional Board in public meetings held in September and October 2000. After a lengthy hearing on September 15, 2000, the matter was continued to allow further exploration of two issues: (1) an alternative offshore location for the cooling water intake, and (2) the proposed mitigation plan. The continued hearing took place on October 27, 2000. At the conclusion of that hearing, the Regional Board approved the permit.
Over the course of the two public meetings, the Regional Board was provided with many documents. The two agenda packets alone contain a total of nearly 300 pages. The Board also received testimony at both hearings. Of that extensive body of written and oral evidence, a relatively small portion dealt with cooling water alternatives. We summarize that portion of the evidence now.
Staff Report: A 24-page staff report was prepared for the September hearing, which refers to best technology available (BTA) alternatives in three places. The first reference to BTA in the staff report is this statement: "The Discharger must use BTA to minimize adverse environmental impacts caused by the cooling water intake system. If the cost of implementing technological alternatives for achieving BTA is wholly disproportionate to the environmental benefits to be achieved, the Board may consider alternative methods to mitigate these adverse environmental impacts. In this case the cost of technical alternatives for eliminating entrainment impacts (such as cooling towers) is wholly disproportionate." The next reference to BTA alternatives is Table 2, entitled "Best Technology Available Costs (New Units Only)", with cost figures supplied by Duke. The third reference to BTA is staff's discussion of alternatives in response to a comment by the Center for Marine Conservation. The comment states: "Power plant modifications that avoid impacts, such as cooling towers, should be chosen over mitigation." Staff responds: "Cooling towers are the only alternative for definitely eliminating significant impacts due to entrainment.... To our knowledge, there are no salt water cooling towers in place for a facility like the Moss Landing Power Plant. Cooling towers are massive structures, they present other impacts (construction, noise, aesthetic, fog, etc[.]) and they are relatively expensive (up to $114 million in this case). The range of productivity loss, and our interpretation of that range, does not support pursuing technological alternatives to eliminate entrainment impacts." Staff thus recommended granting the NPDES permit as drafted, allowing the use of once-through cooling, but requiring Duke to fund a $7 million mitigation plan to address the adverse environmental effects of entrainment.
Energy Commission Documents: The transcript of the September hearing indicates that the Board received an excerpt of the Energy Commission's Presiding Member's Proposed Decision covering "those issues that are before the board today, which are the thermal[,] entrainment and impingement issues." The agenda packet for the October meeting includes several other items from the Energy Commission: a two-page excerpt from its June 2000 Final Staff Assessment containing Table 7, which sets out BTA alternatives and their costs and gives a short description of three alternatives (air-cooled condensers, an offshore intake location, and an alternate onshore *524 location); and a portion of the transcript of the June 2000 evidentiary hearing before the Energy Commission addressing the offshore alternative.
§ 316(b) Report: The transcript of the October hearing indicates that the Board was given Chapter 7 of Duke's § 316(b) Report. That chapter consists of 40 pages of text and charts evaluating alternative intake technologies.
Presentation by Dr. Raimondi: At the October hearing, a slide presentation was given by Peter Raimondi, one of two independent scientists hired by the Regional Board. In his presentation, Raimondi analyzed several cooling alternatives: air cooled towers and closed cycle water cooling (mechanical and natural draft towers). His analysis involved four criteria: (1) is the alternative available and reliable; (2) does the alternative provide further reduction in aquatic organism losses; (3) does the alternative offer site-specific feasibility; and (4) what are its economic costs.[7] Raimondi also discussed an alternative water intake location offshore.
Testimony: At both hearings, speakers addressed the Regional Board during the public comment period, some in person and some by letters read into the record. Several speakers mentioned cooling water alternatives. At the September hearing, a representative of the Department of Fish and Game noted that alternatives were considered, including cooling towers. However, she added: "In the report, it does indicate they are very expensive." Three other speakers at that first hearing commented on the lack of consideration of alternatives. Two of them urged the Board to postpone approval of the permit to allow further analysis of cooling tower alternatives. At the October meeting, four other speakers likewise urged the Board to delay permit approval on that ground.

d. Analysis by the Regional Board
As the foregoing summary shows, evidence of alternatives to once-through cooling was presented to the Regional Board. The pivotal questions are whether that evidence was sufficient and whether the record demonstrates that the Board analyzed the alternatives. The trial court answered both questions in the negative. In particular, the court found no meaningful analysis by the Regional Board. At least as to that point, we are compelled to agree. As the record indicates, two individual board members criticized the alternatives analyses, but there is no evidence that the Board as a whole analyzed or even discussed the issue.
Board Member Statements: At the September hearing, after presentations by and on behalf of staff, Regional Board Member Shallcross said: "Obviously, the most preferred alternative is to avoid the taking or damaging altogether. And looking at the best technology, Table 2 in the staff report, you have a list of different technologies and their cost over the project life. I *525 would have to agree most of them are probably, what is the word, wholly disproportionate. [¶] However, the one that interests me is the offshore intake and the cost over the project life; it says it wasn't specified." During deliberations, he reiterated: "I'm very disappointed that the whole idea of putting the intake structure out, out in the ocean wasn't vetted, basically, at all." He continued: "I definitely would like to see the intakeoffshore intake vetted and some of these other things I've mentioned, in particular more specifics on the mitigation plan." He thus concluded: "I won't be able to support this today." As noted above, the matter was thereafter continued to allow further discussion of the offshore intake alternative and the mitigation package.
At the October meeting, during Raimondi's presentation, Board Member Shallcross expressed concern about the analytic method used for examining the alternatives, specifically their elimination from consideration upon failure to meet one of the four criteria identified by the scientist. As he put it, "one of my problems with this was that all the alternatives weren't fully analyzed." Shallcross later expressed his disappointment with the way alternatives analysis was handled overall. In his view, "the technological alternatives were set aside rather quickly. And all the time was spent on developing the mitigation plan." Another Board member, Daniels, agreed, noting that "things like distillation were not even considered at all." Nevertheless, Shallcross said, "I'm going to trust staff on this, on the alternatives, on the technological alternatives, and I am going to support the motion" to approve the permit.
Trial Court's Determination: In the trial court's view, the Regional Board did not conduct an adequate analysis of the alternatives for achieving BTA. For one thing, the court observed, the Regional Board "apparently accepted" Duke's cost estimates "without any independent study or analysis." The court therefore took issue with the resulting conclusion that the cost of alternative cooling technologies was wholly disproportionate to their benefits, finding evidence on that point "at best meager, and at worst, speculative and based on historical conjecture." For another thing, the court found "no evidence in the record of a comprehensive, definitive consideration of cooling water alternatives by the Regional Board to apply Best Technology Available to the Moss Landing Power Plant." Under the deferential standard that governs our review of the trial court's decision, we are compelled to adopt its view of the record, as we now explain.

5. Discussion
In affirming the trial court on this point, we honor the important principle that the administrative body charged with responsibility for a particular determination must itself examine and ultimately decide the question.
That principle finds frequent expression in cases involving the California Environmental Quality Act. As has been said in the CEQA context, the responsible agency must show that its "approval of the proposed project followed meaningful consideration of alternatives and mitigation." (Mountain Lion Foundation v. Fish & Game Com. (1997) 16 Cal.4th 105, 134, 65 Cal.Rptr.2d 580, 939 P.2d 1280.) CEQA thus "requires the public agency to consider feasible alternatives to the project which would lessen any significant adverse environmental impact." (Id. at p. 123, 65 Cal.Rptr.2d 580, 939 P.2d 1280.) Furthermore, under CEQA, "a decisionmaking agency is prohibited from approving a project for which significant environmental effects have been identified unless it makes specific findings about alternatives and *526 mitigation measures." (Id. at p. 134, 65 Cal.Rptr.2d 580, 939 P.2d 1280, citing Pub. Res.Code, § 21081.) "The agency's decisionmaking body must adopt the required findings itself. It may not delegate the duty to make findings to agency staff or a subordinate body." (Protect Our Water v. County of Merced (2003) 110 Cal.App.4th 362, 372,1 Cal.Rptr.3d 726.)
A CEQA decision thus is subject to reversal when there "is no evidence in the record" demonstrating that the agency "evaluated feasible mitigation measures during its review...." (Mountain Lion Foundation v. Fish & Game Com., supra, 16 Cal.4th at p. 134, 65 Cal. Rptr.2d 580, 939 P.2d 1280.) The "cursory rejection" of a proposed alternative "does not constitute an adequate assessment of alternatives as required under CEQA" and it "fails to provide solid evidence of a meaningful review of the project alternative that would avoid the significant environmental effects identified...." (Id. at p. 136, 65 Cal.Rptr.2d 580, 939 P.2d 1280.)
We think that those principles apply with equal force here. As the agency charged with making the BTA determination, the Regional Board was required to meaningfully analyze the alternatives itself. As a duly constituted deliberative body, the Board is required to undertake its own examination of the evidence, whether provided by the applicant, by independent consultants, or even by its own staff. We acknowledge the authority cited by respondents, which holds that staff opinion may constitute sufficient evidence to support an agency's decision. (Browning-Ferris Industries v. City Council (1986) 181 Cal.App.3d 852, 866, 226 Cal. Rptr. 575, citing Coastal Southwest Dev. Corp. v. California Coastal Zone Conservation Com. (1976) 55 Cal.App.3d 525, 535-536, 127 Cal.Rptr. 775; see also, e.g., City of Rancho Cucamonga v. Regional Water Quality Control Bd. (2006) 135 Cal. App.4th 1377, 1387, 38 Cal.Rptr.3d 450.) But staff opinion, no matter how well researched and supported, is no substitute for meaningful decision-making by the responsible agency itself.
The administrative record before us supports the trial court's conclusion that the Regional Board failed to analyze BTA alternatives during its deliberations in September and October 2000. (See Walters v. Pine Cove County Water Dist. (1960) 177 Cal.App.2d 498, 501, 2 Cal.Rptr. 253.) Under these circumstances, we find no basis for reversing the trial court's findings concerning the evidence and its decision to remand "to the board for further consideration and hearing...." (Ibid.)

C. Conclusions
To sum up, we find that the administrative remand was procedurally proper; we therefore reject appellant's contrary contentions. We also conclude that the trial court had an adequate evidentiary basis to support its remand order; for that reason, we rebuff respondents' challenge.
That brings us to appellant's claims arising from the administrative hearing following remand and from the ensuing judicial proceeding.

III. Post-Remand Administrative Proceedings
Concerning the May 2003 administrative hearing, appellant argues that the Regional Board erred in considering new evidence on remand. Appellant also asserts that the Board improperly excluded a letter containing its written arguments and evidence. Respondents dispute both of appellant's contentions.
The trial court explicitly ruled against appellant as to both claims. First, the court concluded, the Regional Board *527 "complied with the remand order" in taking new evidence. Second, the court found, "fair and appropriate rulings were made regarding admissibility of evidence, while maintaining a focus on the remand issue." On appeal, we review the factual basis for the trial court's determinations for substantial evidence. (City of Rancho Cucamonga v. Regional Water Quality Control Bd., supra, 135 Cal.App.4th at p. 1384, 38 Cal.Rptr.3d 450.) However, to the extent that the court's determinations relate to procedural due process claims, they are "reviewed de novo on appeal because the ultimate determination of procedural fairness amounts to a question of law." (Nasha v. City Of Los Angeles (2004) 125 Cal.App.4th 470, 482, 22 Cal. Rptr.3d 772.)

A. Background
In March 2003, the Regional Board gave written notice that it would conduct a remand hearing on May 15, 2003. As indicated in the notice, the parties to the hearing were the Regional Board, Duke, appellant, and the Energy Commission.
After setting forth background information, the notice explains: "The Regional Board is convening this hearing in order to provide an opportunity for all parties to present evidence and analysis regarding the BTA alternatives, their costs and their environmental benefits. The best way to provide a comprehensive and thorough analysis of these issues is to consider the wide range of evidence and arguments submitted on all sides as well as comments from the public." As to the scope of the hearing, the notice states: "The Court did not remand the entire NPDES permit. [¶] ... [¶] The court only held that the Regional Board did not have sufficient evidence to support its finding that costs of alternatives to minimize entrainment impacts are wholly disproportionate to the environmental benefits." The notice further indicates that "because there was no challenge" concerning the effects of once-through cooling on impingement or thermal discharge, "the issues in this hearing relate only to entrainment impacts of the [new] Units 1 & 2 cooling water intake."
Concerning procedure, the notice advises: "Testimony, other evidence and legal arguments submitted in this hearing must be in accordance with this Notice. Only relevant testimony and other evidence will be accepted into the record." The notice lists the relevant issues.[8] It provides a schedule for the submission of written testimony, with an April 14th deadline for direct testimony, evidence, and argument, and an April 28th deadline for rebuttal. The notice also describes the conduct of the meeting, including the order of oral presentations and the time limits for each party.
The notice prompted a number of submissions, comments, and other responses.

1. Duke's Submissions
In response to the hearing notice, Duke submitted a document containing 192 pages of direct testimony, including attachments, plus professional resumes for its witnesses. Duke's submission was received on April 14, 2003.
Duke characterized its analysis of alternatives as "built off of but "more thorough" *528 than its § 316(b) Report. Since entrainment was the sole focus, closed-cycle systems were the only technology alternatives considered. Six options were explored: mechanical draft cooling using seawater; mechanical draft cooling using fresh water; natural draft cooling; air (dry) cooling; hybrid wet/dry cooling; and spray ponds. Duke's Appendix D assessed the six identified alternatives, analyzing costs and environmental factors for each. Other appendices provided further economic information. Duke later submitted "comments in lieu of rebuttal testimony," a letter from its counsel responding to a public comment from the California Coastal Commission, and a two-page document entitled "ErrataDuke Testimony, Appendix D." That last document corrected some of the previously submitted information concerning plant efficiency and other matters.

2. Staffs Submissions
The Regional Board's staff submitted a report with 13 pages of text, plus several additional pages listing attachments, references, and other documents in the record. There are 14 attachments to the staff report, comprising more than 380 pages in all.
The report advises that "staff reviewed all known intake structure technologies, such as screening devices, filters, etc., and alternatives for reducing cooling water flow, such as seasonal flow limits, variable speed pumps, and closed cooling systems." Concerning the first category (intake structure devices), the staff report describes them as "experimental" and "not demonstrated available technologies for MLPP [Moss Landing Power Plant]." Turning to the second category (flow reduction devices), the report rejects seasonal limits and pumps as "not applicable" or unlikely to provide "increased benefit" for minimizing entrainment. The report thus focuses on closed cycle systems as alternative technologies for reducing the plant's cooling water intake. The report summarizes these alternatives as follows: "Closed cooling systems, such as mechanical draft cooling towers or dry cooling would provide a significant reduction in entrainment, up to 100%. Staff considers these alternatives to be demonstrated available technologies, and has little evidence that they could not be installed at MLPP. However, the cost of these alternatives is estimated to be approximately $47 million to $124 million. [¶] The estimated value of the entrainment losses is $1.2 to $9.7 million based on staffs habitat equivalency conversion method.... [¶] Staffs conclusion is that ... the cost of closed cooling systems is wholly disproportionate to their benefit." The cost figures used by staff are ascribed to the Environmental Protection Agency. The report also touches on some environmental issues resulting from the alternatives, such as the possibility of "salt drift on agriculture" if saltwater mechanical draft towers were used.
The staff report recommends that "the Regional Board determine that the weight of the evidence supports Finding No. 48 of the NPDES permit for MLPP, which states that the costs of alternative cooling technologies are wholly disproportionate to the benefit to be gained."
Staff later submitted rebuttal, commenting on Duke's testimony, particularly its alternatives analysis, and responding to public comments from the Elkhorn Slough Coalition and the California Coastal Commission.

3. Board Counsel's Correspondence
Acting as the Regional Board's legal advisor, Senior Staff Counsel Jennifer Soloway submitted a memorandum "to provide guidance to the Board on the purpose *529 of this hearing and the applicable law." Dated April 11, 2003, the memorandum: (1) describes the trial court's order; (2) discusses the "legal guidance" available for applying the governing law, section 316(b) of the Clean Water Act, which requires the best technology available (BTA); (3) details the statutory factors for BTA analysis; (4) describes standards for determining whether a particular technology is available; and (5) offers advice on applying the "wholly disproportionate" test.
The record also contains another correspondence from Soloway, this one a letter dated May 9, 2003 and directed to Jeff Young, the Regional Board's Vice Chair. Counsel's letter states: "You have requested copies of opinions, decisions, and analyses pertaining to the wholly disproportionate cost analysis." Counsel adverted to two court opinions already in the record and forwarded seven additional documents. She noted, however: "The following NPDES permit decisions and analyses include discussions of section 316(b) as it applies to certain power plants. Because 316(b) is applied on a case-by-case basis, these documents are instructive but are not binding on the Board."

4. Appellant's Responses and Submittals
In its first response to the hearing noticea letter dated March 24, 2003appellant objected to the format of the scheduled hearing and requested a continuance. Roger Briggs, the Regional Board's executive director, forwarded the letter to the other parties, gave them a deadline to respond, and advised appellant to proceed according to the extant hearing notice unless advised to the contrary. Duke and the Energy Commission both responded; each asked the Regional Board to overrule appellant's objections and to deny the requested continuance. By letter of April 3, 2003, Briggs overruled appellant's objections and refused to postpone the hearing. That letter closed with a reminder that appellant's submission was due by April 14th, the previously established deadline for presenting direct evidence and argument in writing.
Appellant submitted a letter dated April 14, 2003, in which it: repeated its view that defects in the NPDES permit required its reopening; opined that those defects would "not be cured by the proposed new hearing process"; and stated its intent to "preserve[ ] and reassert[ ] these additional objections to the Permit." Appellant further advised that it was "proceeding with a petition for writ of mandate to the Court of Appeal" and thus "respectfully declines to submit any testimony at this time."
On April 28, 2003, appellant submitted further correspondence from its counsel. In its opening paragraph, the letter states that it is in response to the staff report and other submittals. The letter reiterates appellant's position that "the only proper course of action in this matter is to reopen the existing NPDES permit" but continues: "in order to fully preserve its rights and to assist the Board's future deliberations over this important public policy matter, Voices submits the following preliminary comments. When the Board properly notices a new draft permit, we will, of course, provide additional testimony and comments." In a discussion titled "Threshold Issues," the letter asserts that the purpose of the hearing is not clear, that new evidence should not be taken, and that the Regional Board's counsel mischaracterized the trial court's decision. Under the heading "Additional Matters for Consideration in a New Permit Process," appellant provides a detailed legal analysis setting forth its view of Clean Water Act *530 section 316(b), particularly the role of costs and mitigation.
Appellant's April 28th submittal was rejected for inclusion in the written record for the hearing. As stated in a May 14th letter by Bruce Daniels, Regional Board Chair, the decision was made on the grounds that appellant's letter was untimely and beyond the scope of the hearing issues.[9] Before explaining his determination, Daniels first observed that appellant's April 28th correspondence "seems to have been submitted to address future deliberations of the Board that theoretically will occur if [appellant's] request to vacate the existing NPDES permit is granted." Daniels nevertheless acknowledged the possibility that appellant "intends to augment the administrative record and participate in the current hearing." He continued: "in case that is their intent, the following discussion explains that because the letter was not submitted in accordance with the deadlines and requirements of the Notice, it will not be accepted into the administrative record and will not be distributed to the Board members in the course of the above-referenced hearing." The letter from Daniels apparently did not reach appellant prior to the May 15th hearing.
Appellant arranged for another submission on April 28th, this one a memorandum authored by three individuals, including Dr. Brent Haddad of the University of California, Santa Cruz. It states: "We are submitting this memorandum to the Board in an effort to clarify the inadequacies" in the submissions by Duke and Regional Board staff. The Haddad memorandum continues: "Section 316(b) of the Clean Water Act states that cooling water intake structures must be of the best technology available (BTA), although courts have subsequently allowed exceptions for cases of wholly disproportionate costs and benefits.... The costs and benefits used by Duke and the Board staff are not comprehensive nor do they meet the standards laid out in the law with regard to incremental costs and benefits."[10] Following a *531 detailed analysis, the memorandum concludes that "a strong case can be made on purely economic grounds that the assessment so far inadequately meets the `wholly disproportionate' requirements of 316(b) of the Clean Water Act." This memorandum was admitted into evidence at the hearing.

5. The Hearing
At the start of the May 15th remand hearing, Regional Board Chair Daniels reiterated the procedures for the hearing as described in the hearing notice. Daniels then announced that several documents had been received "after the deadlines in the notice." He identified two late submittals that nevertheless had been admitted: a public comment from the Elkhorn Slough Coalition, and the Haddad memorandum. Daniels then stated: "The other late submittals are not admissible to the record for this hearing" but he did not specify what particular items were excluded. A Regional Board staff member later made an objection to Haddad's memorandum as being outside the scope of the hearing, but that objection was overruled.
After Daniels made his opening comments, one board member (Shallcross) recused himself. Board counsel Soloway then explained her role, summarized the history of the proceedings, and described the nature and scope of the hearing. Soloway advised the Regional Board: "You are not required in any way to stick by the original decision the board made in 2000. The Court remanded this for you to look at this again." In response to a board member's question, a representative from the Regional Board's staff indicated that there had been "major additions to the record."
Following these preliminaries, the parties' oral presentations began, starting with Regional Board staff. Within their respective time allocations, the parties were permitted to cross-examination each other's witnesses, and board members' questions were allowed as well. Before cross-examining Duke's witnesses, appellant's counsel again objected to the Board's decision to accept new evidence. After presentation of the parties' evidence, the Board took public comments and then entertained the parties' closing statements before beginning its deliberations.
At the conclusion of the hearing, by majority vote on a formal motion, the Regional Board stated that it had undertaken "a thorough and comprehensive analysis" and concluded that Finding No. 48 of the NPDES permit for the Moss Landing Power Plant was "supported by the weight of the evidence." A formal resolution to the same effect followed.

B. Legal Issues
Before addressing appellant's specific claims of error, we begin with some general observations about the nature of the administrative proceeding at issue here and the proper scope of judicial review.
NPDES permit proceedings typically are subject to informal adjudication *532 procedures under the Administrative Procedures Act. (City of Rancho Cucamonga v. Regional Water Quality Control Bd., supra, 135 Cal.App.4th at pp. 1381, 1385, 38 Cal.Rptr.3d 450, citing Gov.Code, §§ 11445.10 et seq., and Cal.Code of Regs., tit. 23, §§ 647-648.8.) "While administrative bodies are not expected to observe meticulously all of the rules of evidence applicable to a court trial, common sense and fair play dictate certain basic requirements for the conduct of any hearing at which facts are to be determined. Among these are the following: the evidence must be produced at the hearing by witnesses personally present, or by authenticated documents, maps or photographs; ordinarily, hearsay evidence standing alone can have no weight [citations], and this would apply to hearsay evidence concerning someone else's opinion; furthermore, cross-examination within reasonable limits must be allowed." (Desert Turf Club v. Board of Supervisors (1956) 141 Cal. App.2d 446, 455, 296 P.2d 882; accord, Ashford v. Culver City Unified School Dist., supra, 130 Cal.App.4th at p. 349, 29 Cal.Rptr.3d 728; Gov.Code, § 11513, subd. (c); see generally, 1 Witkin, Cal. Evidence (4th ed. 2000) Introduction, § 55, pp. 60-62; id. (2006 supp.) p. 18.)
On judicial review, the administrative proceedings enjoy a presumption of regularity, which generally extends to procedural matters, including evidentiary rulings. (City of Rancho Cucamonga v. Regional Water Quality Control Board, supra, 135 Cal.App.4th at p. 1384, 38 Cal. Rptr.3d 450.) When the basic fairness of an administrative hearing is challenged, however, the appellate court independently reviews the claim as a question of law. (Sinaiko v. Superior Court (2004) 122 Cal. App.4th 1133, 1140,19 Cal.Rptr.3d 371; id. at p. 1141, 19 Cal.Rptr.3d 371 ["wholesale disqualification of petitioner's experts rendered the administrative proceedings unfair as a matter of law"].)
With that background, we turn to appellant's claims of administrative error at the remand hearing.

1. The Decision to Take New Evidence
Appellant's first complaint is that the Regional Board erred in accepting new evidence at the remand hearing. To the extent that this argument constitutes an attack on the trial court's authority to remand, we have already resolved the question adversely to appellant. Beyond that, we find no merit in the argument.
Where further administrative proceedings are warranted, they may involve the admission of new evidence. (See, e.g., Keeler v. Superior Court, supra, 46 Cal.2d at p. 600, 297 P.2d 967 [upholding remand procedure "for the taking of further evidence"].) In one case, for example, a writ issued ordering the Department of Motor Vehicles both "to set aside its decision revoking [the petitioner's] probation and suspending his license and to reinstate [his] license as it existed immediately prior to that suspension." (Carlton v. Department of Motor Vehicles (1988) 203 Cal. App.3d 1428, 1435, 250 Cal.Rptr. 809.) On appeal, the agency complained that the trial "court erred in not specifically remanding the matter to the DMV for a new hearing." (Id, at p. 1434, 250 Cal.Rptr. 809.) The appellate court stated: "Where an administrative decision is set aside for insufficiency of the evidence it is customary to remand the matter to the agency for a new hearing...." (Ibid.) With a new hearing, the court agreed, it was "conceivable the DMV could produce competent evidence sufficient to establish" the petitioner's responsibility for the underlying accident. (Id. at pp. 1434-1435, 250 Cal. Rptr. 809.) As pertinent here, the court emphatically explained: "Nothing in the *533 writ of mandate precludes it from doing so." (Id. at p. 1435, 250 Cal.Rptr. 809.) Other cases likewise recognize the agency's discretion to consider new evidence on remand. (See, e.g., Zink v. City of Sausalito (1977) 70 Cal.App.3d 662, 666, 139 Cal.Rptr. 59 [where "the trial court's independent review of the evidence determines that some of the substantive findings ... are unsupported by the evidence, remand to the administrative body is the only means of permitting it to exercise its discretion"]; Overton v. State Personnel Bd. (1975) 46 Cal.App.3d 721, 725, 120 Cal. Rptr. 226 ["evidentiary deficiency requires that ... the peremptory writ issue"]; Garcia v. California Emp. Stab. Com. (1945) 71 Cal.App.2d 107, 110, 161 P.2d 972 [due to "the insufficiency of the evidence in the record filed herein to support the findings of the board, it is necessary that this application be remanded for further evidence"]; cf., Moyer v. State Board of Equalization (1956) 140 Cal.App.2d 651, 654, 295 P.2d 583 [under Gov.Code, § 11521, agency's reconsideration may be based on "all the pertinent facts of the record and such additional evidence and argument as may be permitted"].) As the foregoing authority demonstrates, on remand or reconsideration, an administrative agency may admit new evidence as necessary to a proper determination of the issues before it.
The cases cited by appellant do not dictate a contrary conclusion. They stand for the unremarkable proposition that a court may not consider "extra-record" evidence that was not presented to the agency. (See, e.g., Western States Petroleum Assn. v. Superior Court (1995) 9 Cal.4th 559, 576, 38 Cal.Rptr.2d 139, 888 P.2d 1268; Cadiz Land Co. v. Rail Cycle (2000) 83 Cal.App.4th 74, 120, 99 Cal. Rptr.2d 378; Friends of the Old Trees v. Department of Forestry & Fire Protection (1997) 52 Cal.App.4th 1383, 1390, 61 Cal. Rptr.2d 297.) As California Supreme Court authority makes clear, the overriding purpose of "restricting review . .. to the administrative record" is to ensure that the courts do not "engage in independent factfinding rather than engaging in a review of the agency's discretionary decision." (Friends of the Old Trees v. Department of Forestry & Fire Protection, at p. 1391, 61 Cal.Rptr.2d 297, discussing Western States Petroleum Assn. v. Superior Court, at p. 576, 38 Cal.Rptr.2d 139, 888 P.2d 1268.) Nothing in these cases prevents an agency from supplementing its own record on remand.
In sum, the agency acted properly in accepting additional evidence in response to the court's remand order.
For the same reasons, the trial court correctly considered this new evidence at the post-remand judicial hearing. Indeed, review of that evidence was not only proper, it was necessary given the court's prior determination that the agency's initial analysis was inadequate. As reflected in the trial court's post-remand statement of decision: "It was certainly this Court's expectation that the Board would more fully consider additional relevant evidence on the issue of the best technology available (`BTA'). To meaningfully comply with the remand, a more complete inquiry into BTA necessitated the receipt of further information." Having reviewed "over 6,000 pages" of new administrative evidence, the court determined "that the Board engaged in the kind of scrutiny and analysis that the issue required." The augmented administrative record thus helped guide the trial court in its "review of the agency's discretionary decision." (Friends of the Old Trees v. Department of Forestry & Fire Protection, supra, 52 Cal. App.4th at p. 1391, 61 Cal.Rptr.2d 297.) By considering the additional evidence adduced at the remand hearing, the court *534 adopted the proper analytic focus: reviewing the agency's expanded fact-finding rather than engaging in its own. (Ibid.)
We therefore reject appellant's assertion that "such an approach would lead to the very kind of post hoc agency rationalizations that the courts have soundly rejected, and it would make a mockery of the section 1094.5 administrative mandamus provision and decades of case law" as well as its dire prediction that "the fundamental building blocks of administrative law, which guard against arbitrary and capricious decisionmaking by our otherwise unaccountable public agencies," will thereby "lie in shambles." To the contrary, we conclude, the challenged procedure helped to ensure a more thorough and meaningful administrative process, without sacrificing procedural protections or encouraging after-the-fact justification.

2. The Decision to Exclude Appellant's Written Submission
Appellant next challenges the exclusion of its counsel's April 28th letter, made on the grounds that it was untimely direct evidence and that it largely addressed matters beyond the scope of the remand order. Describing its April 28th letter as containing "detailed legal and policy arguments regarding the propriety of staffs chosen cost analysis and the legality of the habitat mitigation approach on which staffs analysis relied," appellant characterizes its submission as proper rebuttal argument and thus timely. Moreover, appellant insists, it was prejudiced by the exclusion of this document, notwithstanding the trial court's finding to the contrary.
The Administrative Procedures Act contemplates liberality in admitting evidence at adjudicative proceedings such as the one at issue here. (City of Rancho Cucamonga v. Regional Water Quality Control Board, supra, 135 Cal.App.4th at p. 1385, 38 Cal.Rptr.3d 450.) In NPDES proceedings such as this, "wide latitude" is "allowed an administrative agency in the receipt of evidence...." (U.S. Steel Corp. v. Train (1977) 556 F.2d 822, 836-837.) Even so, unless exclusion of the evidence rendered the entire proceeding unfaira claim that appellant does not advancethe Board chair's decision to reject appellant's submission comes clothed in a presumption of regularity. (City of Rancho Cucamonga, at p. 1384, 38 Cal.Rptr.3d 450; So. Cal. Jockey Club v. Cal. etc. Racing Bd. (1950) 36 Cal.2d 167, 175, 223 P.2d 1 [trial court properly rebuffed the contention "that competent evidence offered by plaintiff was rejected" by the agency]; cf., Sinaiko v. Superior Court, supra, 122 Cal.App.4th at 1140, 19 Cal.Rptr.3d 371 [trial court's exclusion of petitioner's experts violated due process].)
Appellant has the burden of demonstrating error. (Fukuda v. City of Angels, supra, 20 Cal.4th at p. 817, 85 Cal. Rptr.2d 696, 977 P.2d 693.) As we now explain, appellant failed to carry that burden here. We thus affirm the trial court's approval of the administrative decision to exclude appellant's submittal as untimely and outside the scope of the hearing.

a. Timeliness
The hearing notice established an April 14th deadline for direct testimony, evidence, and argument. The requirement for early submittal of direct written testimony is expressly permitted by regulations governing the Water Boards' adjudicative proceedings. As pertinent here, those regulations provide: "The hearing notice may require that direct testimony be submitted in writing prior to the hearing," (Cal.Code Regs., tit. 23, § 648.4(c).) That practice is in keeping with the Water Boards' policy "to discourage the introduction of surprise testimony and exhibits." *535 (Id., § 648.4(a).) The regulations also provide consequences for noncompliance: "Where any of the provisions of this section have not been complied with, the presiding officer may refuse to admit the proposed testimony or the proposed exhibit into evidence, and shall refuse to do so where there is a showing of prejudice to any party or the Board." (Id., § 648.4(e).)
To the extent that appellant's April 28th submission represents direct testimony, it was untimely and subject to exclusion on that ground alone. (Cal.Code of Regs., tit. 23, § 648.4(c), (e).) Appellant characterizes the letter as rebuttal, however. And as longstanding California Supreme Court precedent teaches, "improper restrictions on the right to present evidence in rebuttal" may constitute "a deprivation of the constitutional guaranty of due process of law." (Pence v. Industrial Acc. Com. (1965) 63 Cal.2d 48, 50-51, 45 Cal.Rptr. 12, 403 P.2d 140.)
As a close reading demonstrates, appellant's April 28th letter is susceptible of several different interpretations, a point recognized by Regional Board Chair Daniels. On the one hand, it can be fairly read as simply rejecting the remand process as illegitimate, preserving objections, and addressing theoretical future deliberations.[11] Alternatively, as Daniels acknowledged, the letter could be interpreted as an attempt to "participate in the current hearing."
Viewed as a proffer of evidence and argument for the May 15th remand proceeding, we agree that appellant's April 28th letter was not rebuttal. To be sure, appellant takes Duke and the Regional Board staff to task for perceived analytic errors and evidentiary omissions. For the most part, however, it does so by setting up then knocking down straw men, without actually rebutting any direct evidence. Appellant employs this tactic with each of the three substantive topics it discusses.[12]
In its first argument, appellant decries staffs recommendation as "entirely without legal or factual support." Appellant offers its assessment of what staffs "logic ... seems to be," then promptly disparages it as a "tautological analysis" that is "entirely inconsistent with the plain language of the Clean Water Act and EPA's interpretation of the statute." Having given itself that opening, appellant devotes *536 several pages to presenting its view of the proper interpretation of federal water law.
Appellant continues in this vein with its second point, which concerns the valuation of costs and benefits. In appellant's words, "the Board cannot selectively choose only certain `benefits' to consider and weigh against the full costs of alternative technologies. That, however, is exactly what Staff proposes in this case." Again, though, appellant's arguments on this point are addressed to its view of what "the new Staff Report suggests" rather than what that report contains by way of rebuttable evidence. To the extent that appellant does refer specifically to evidence adduced on direct, its discussion is mainly limited to reasserting that Board cannot lawfully consider new evidence unless it reopens the permit. Appellant's other comments about "Staffs truncated approach to valuing benefits" are offered merely as a springboard for its own analysis of the issue, which should have been offered on direct.
Introducing its third and final main point, appellant states: "The heart of the problem with the existing permit is the Board's reliance on $7 million in `mitigation' funding in lieu of BTA." As to that issue, appellant offers legal arguments about the validity and application of the mitigation approach. These arguments do not specifically address any evidence submitted for the hearing, however. Nor do they attempt to counter the legal analysis provided by Board Counsel Soloway concerning mitigation.[13] Instead, appellant advances these legal arguments as support for its own interpretation and application of the statute. Appellant's legal arguments concerning mitigation thus are not rebuttal. Finally, to the extent that appellant addresses substantive aspects of the mitigation plan, its arguments are beyond the scope of the hearing issues, a point we now address.

b. Relevance
Stressing the importance of its proffered information on mitigation, appellant contends that its exclusion was both erroneous and prejudicial. Appellant cites "the apparent misunderstanding of Board decisionmakers about the use and availability of mitigation funding as a substitute for technology under section 316(b)," and opines that there is no way to determine whether "the improper exclusion of Appellant's submittal would have made a difference" in the outcome. But the mitigation planalso known as the habitat or environmental enhancement program was not at issue in the hearing, except insofar as its economic aspects relate to the question of whether the costs of alternative technologies were wholly disproportionate to their benefits. As Board counsel Soloway observed in her introductory remarks at the hearing: "The habitat enhancement program was not questioned by the Court. And in fact is outside the scope of the language of 316( [b])." During the hearing, Board Chair Daniels likewise addressed the mitigation plan on several occasions, usually in the process of preventing testimony about its ecological aspects. Each time, he hewed to the distinction between the scientific and the economic *537 aspects of the program. Thus, for example, Daniels said: "We do need to talk about costs because you can't talk about wholly disproportionate without talking about costs and benefits. I think where we step off the end is where we start talking about the habitat program which is outside the intake structure issue and is a completely different mechanism than to try to mitigate against those impacts. So we are not going to talk about the habitat program. You can talk about the costs, the benefits, the impacts of the current plan, and any of these proposed different intake regimen[ ]s, but not the habitat program." At another point in the hearing, during testimony by Haddad about the availability of replacement wetlands, Daniels stated: "That's an issue we are not dealing with here. If you want to talk about how it relates to valuation, that's okay."
In administrative proceedings, "the basic requirement of relevancy remains." (1 Witkin, Cal. Evidence, supra, § 64, p. 69.) Both "oral and written evidence ... should be considered if relevant to the issues." (Allied Comp. Ins. Co. v. Ind. Acc. Com. (1961) 57 Cal.2d 115, 120, 17 Cal.Rptr. 817, 367 P.2d 409.) By the same token, of course, it is not error to exclude irrelevant evidence. (Id. at p. 121, 17 Cal.Rptr. 817, 367 P.2d 409 [referee properly rejected "further medical evidence bearing on the extent of [the employee's] disability and other evidence relating to her occupational classification" where the hearing was limited to "the accuracy of the rating expert's conclusion"]; see also, e.g., Ashford v. Culver City Unified School Dist., supra, 130 Cal.App.4th at p. 350, 29 Cal.Rptr.3d 728 [videotapes that lacked "authenticating foundation ... were irrelevant"]; Vielehr v. State Personnel Bd. (1973) 32 Cal.App.3d 187, 195-196, 107 Cal.Rptr. 852 [discussing relevance of proffered evidence].)
The relevance of appellant's evidence depends on whether it addressed the limited issue before the Board. As explained above, the Board was not considering the scientific validity of the mitigation plan. Instead, the question before the Board was purely economicwhether the habitat equivalency valuation reflected in that plan accurately monetized the entrainment impact. As the Water Boards concede, this distinction between the biological and economic aspects of the mitigation plan sometimes proved slippery during the hearing. Nevertheless, the presiding officer consistently and effectively limited the evidence to the program's economic aspects.
Appellant's April 28th letter does mount a fleeting challenge on that one relevant issue, arguing that "there simply is no credible evidence to support the numbers on which Staff relies; indeed, the limited evidence of wetlands replacement costs in the record from other projects suggests that Staff missed the mark by an order of magnitude," To that limited extent, the letter arguably was relevant. But appellant must show prejudice from its exclusion as well as error. As our high court has long acknowledged, there is no basis for reversing an agency decision to exclude evidence if "`the error complained of has not resulted in a miscarriage of justice.'" (So. Cal. Jockey Club v. Cal. etc. Racing Bd., supra, 36 Cal.2d at p. 176, 223 P.2d 1; Cal. Const, art. VI, § 13.) No prejudice appears here. Appellant was able to offer far more extensive and effective evidence and analysis on this point through Haddad's evidence. Thus, even assuming error in the exclusion of appellant's April 28th letter, there is no prejudice.

*538 C. Conclusion

To sum up, we reject both of appellant's procedural challenges to the post-remand administrative hearing. First, we find no merit in appellant's claim that the agency erred in considering new evidence in response to the court's remand order. The additional evidence permitted a more thoroughgoing administrative process, as the court's remand order contemplated. Furthermore, the augmented record assisted the court in its review of the agency's decision. Second, the agency acted properly in excluding appellant's submittal as untimely and beyond the scope of the issues. To the limited extent that the submittal constituted rebuttal `on relevant aspects of the mitigation plan, appellant suffered no prejudice from its exclusion.
Having rebuffed both of appellant's procedural challenges to the post-remand administrative hearing, we now turn to the judicial proceeding in which the Regional Board's decision was affirmed.

IV. Post-Remand Judicial Proceedings
Appellant challenges the outcome of the post-remand court hearing, arguing in effect that the trial court misinterpreted and misapplied the governing statute, section 316(b) of the Clean Water Act. Respondents dispute those assertions. As a framework for our analysis of this issue, we begin by summarizing the general principles of statutory construction that guide our task. Next, we discuss section 316(b) itself. Finally, we examine how that statute was applied in this case.

A. General Principles of Statutory Construction
The courts' task in interpreting federal legislative acts is to ascertain the intent of Congress. (Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc. (1984) 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694; accord, National Association of Home Builders v. Defenders of Wildlife, supra, 127 S.Ct. at p. 2534.) That task begins with the statutory language itself, which must be read in context. (National Association of Home Builders, at p. 2534; cf., City of Burbank v. State Water Resources Control Board, supra, 35 Cal.4th at p. 625, 26 Cal.Rptr.3d 304,108 P.3d 862.)
"If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress...." (Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., supra, 467 U.S. at pp. 842-843, 104 S.Ct. 2778; accord National Association of Home Builders v. Defenders of Wildlife, supra, 127 S.Ct. at p. 2534.) But where "a fundamental ambiguity ... is not resolved by the statutory text ... [¶] ... it is appropriate to look to the implementing agency's expert interpretation" of the provision at issue. (National Association of Home Builders v. Defenders of Wildlife, at p. 2534.)
Within those parameters, statutory interpretation presents a question of law, which we review de novo. (Yamaha Corp. of America v. State Bd. of Equalization, supra, 19 Cal.4th at p. 7, 78 Cal. Rptr.2d 1, 960 P.2d 1031.) Because a federal statute is at issue here, we look to federal law for guidance. "Although lower federal court decisions are not binding oh this court, they may be persuasive, especially as regards the interpretation of federal law." (Spellman v. Securities, Annuities & Ins. Services, Inc. (1992) 8 Cal. App.4th 452, 459, 10 Cal.Rptr.2d 427; see also, e.g., People v. Bradley (1969) 1 Cal.3d 80, 86, 81 Cal.Rptr. 457, 460 P.2d 129; Adams v. Pacific Bell Directory (2003) 111 *539 Cal.App.4th 93, 97-98, 3 Cal.Rptr.3d 365.) Moreover, the Environmental Protection Agency's "administrative interpretation is relevant" here too, "in light of the State Board's obligation to carry out the objectives of federal law" in issuing NPDES permits. (WaterKeepers Northern California v. State Water Resources Control Bd., supra, 102 Cal.App.4th at p. 1458, 126 Cal.Rptr.2d 389.)

B. Construction of Section 316(b)
With those principles in mind, we now turn to a consideration of the governing statute, section 316(b) of the Clean Water Act (CWA).

1. The Statutory Language
The governing provision reads: "Any standard established pursuant to section 1311 of this title [CWA § 301] or section 1316 of this title [CWA § 306] and applicable to a point source shall require that the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact." (§ 316(b) [33 U.S.C.A. § 1326, subdivision (b)].)
The statutory text is brief but rich. In the opinion of one commentator, "by requiring that `location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact,' Congress has imbued Section 316(b) with more operative terms than any twenty-word phrase in all environmental law." (May & van Rossum, supra, 20 Vt. L.Rev. at p. 377, quoting § 316(b).)

2. Agency Interpretations
Over the decades since the enactment of section 316(b), the Environmental Protection Agency has generated a rather bewildering array of regulatory interpretations, reflected in its rulemaking and in many other documents.

a. Regulations
The EPA's attempts at rulemaking under section 316(b) have a long history. Because the regulations illuminate the agency's understanding of the section, we briefly summarize their development here.
Initial Regulations: The agency first promulgated regulations in 1976. (41 Fed. Reg. 17387 (Apr. 26, 1976.)) They were remanded on procedural grounds in Appalachian Power Co. v. Train (4th Cir.1977) 566 F.2d 451, 457. (Riverkeeper I, supra, 358 F.3d at p. 181.) Thereafter, the agency formally withdrew the regulations. (44 Fed.Reg. 32956 (Jun. 7, 1979).) Pursuant to a 1991 consent decree, the EPA agreed to promulgate regulations in three phases by specified deadlines. (Riverkeeper I, at p. 181; Riverkeeper II, supra, 475 F.3d at p. 90.)
Phase I Rule (New Facilities): "Phase I concerns cooling water intake structures at new facilities." (Riverkeeper I, supra, 358 F.3d at p. 181, fn. 3.) The draft rule was published in August 2000. (65 Fed.Reg. 49060 (Aug. 10, 2000).) The final rule was promulgated in December 2001. (66 Fed. Reg. 65256 (Dec. 18, 2001).) One portion of the final rule permitted a facility to "comply with section 316(b) by undertaking so-called `restoration measures'...." (Riverkeeper II, supra, 475 F.3d at p. 92.)
The Phase I regulations were challenged in Riverkeeper I, supra, 358 F.3d 174, 196-197. On appeal, the court "upheld most aspects of the Phase I Rule, but remanded the provisions relating to the . .. restoration option." (Riverkeeper II, supra, 475 F.3d at p. 92; see Riverkeeper I, supra, 358 F.3d at pp. 189, 191.)
Phase II Rule (Existing Large-Volume Power Plants): The Phase II rule "governs *540 cooling water intake structures at large, existing power plants." (Riverkeeper II, supra, 475 F.3d at p. 92.) The draft rule was issued in April 2002. (67 Fed. Reg. 17122 (Apr. 9, 2002).) The final rule was promulgated in July 2004. (69 Fed. Reg. 41576 (July 9, 2004).)
The Phase II regulations were challenged in Riverkeeper II, supra, 475 F.3d 83, 96-97. After extensively analyzing various elements of the regulations, the court remanded the matter to the agency on procedural and substantive grounds. (Id. at pp. 103, 115, 117.) The court reaffirmed that restoration measures are not permissible compliance alternatives under section 316(b). (Id. at p. 109.) It also addressed the role of costs in the BTA analysis. (Id. at p. 97.) As to that point, the court concluded that costs play a limited role in the determination of best technology available. (Id. at p. 99.)
Phase III Rule (Other Existing Facilities): "Phase III will regulate existing power plants not governed by Phase II, as well as other industrial facilities." (Riverkeeper II, supra, 475 F.3d at p. 90.)
None of the regulations is binding here. The 1976 regulations were remanded then withdrawn. The Phase I regulations apply only to new facilities. (See Riverkeeper II, supra, 475 F.3d at pp. 117-118, 120 [discussing the definition of "new facility" under the Phase I and Phase II regulations].) The Phase II regulations were published in July 2004, long after the October 2000 permit approval at issue here. Therefore, as appellant acknowledged in its written briefs, the Phase II regulations "do not strictly govern" the NPDES permit challenged here. Nonetheless, as indicated above, they do shed light on the agency's understanding of its statutory charge.

b. Other regulatory guidance
Beyond its rulemaking efforts, the Environmental Protection Agency has interpreted section 316(b) in other documents, including its "Draft Guidance for Evaluating the Adverse Impact of Cooling Water Intake Structures on the Aquatic Environment; Section 316(b) P.L. 92-500," issued in May 1977 (hereafter, the 1977 Draft Guidance). In addition, the EPA's general counsel has issued a number of written opinions in connection with specific NPDES permits (hereafter, General Counsel Opinions). Two are of particular interest here: General Counsel Opinion 41 (Environmental Protection Agency, Office of the General Counsel, Opinion 41, June 1, 1976) and General Counsel Opinion 63 (Environmental Protection Agency, Office of the General Counsel. Opinion 63, July 29, 1977). Further insight may be gleaned from the EPA's adjudication of particular NPDES permit applications, which one commentator describes as "a rather detailed administrative `common law' developed as the Agency attempted to apply" the statute. (Rábago, supra, 16 Harv. Envtl. L.Rev. at p. 467.) The same commentator calls the EPA's "extant policy and regulatory statements ... a somewhat incoherent patchwork of information. Though each is helpful, none is enforceable." (Id. at p. 470.)

3. The Statute's Reach
To better understand Clean Water Act section 316(b), we first explore its parameters. We consider three issues related to the statute's reach: the relationship between intake and discharge; the provision's applicability to NPDES permits for existing facilities; and the basis for considering closed cycle alternatives to cooling water intake structures.

a. Relationship between intake and discharge
The first two subdivisions of section 316 address two points on the water use continuum, *541 income and outgo. The intake of water for plant cooling is regulated by 316(b), while discharge of the used, heated water is governed by 316(a). "Section 316(b) is concerned with the adverse environmental impact of the withdrawal of cooling water rather than the discharge of heated water." (General Counsel Opinion 41, p. 5, supra.) It is "the one section of the Act that focuses not on discharges, but on intakes." (Rábago, supra, 16 Harv. Envtl. L.Rev. at p. 437; see also, Riverkeeper II, supra, 475 F.3d at p. 124.) By contrast, section 316(a) is concerned with "whether the discharge exceeds a thermal limitation or whether the discharge interferes with the propagation of a balanced indigenous population of shellfish, fish, and wildlife." (General Counsel Opinion 41, p. 5.) Section 316(a) "permits consideration of the quality of the receiving water for purposes of granting variances with respect to the rules concerning thermal pollution" of the water discharge. (Riverkeeper II, at p. 115, fn. 27.)
Despite these differences, there is a "relationship between the withdrawal of cooling water and thermal discharges." (General Counsel Opinion 63, p. 9.) That relationship has an operational component: the amount of water that goes in is directly related to the amount that comes out. Therefore closed cycle systems, which take in minimal amounts of cooling water in the first instance, "in turn, discharge minimal thermal pollution directly into the water." (Rábago, supra, 16 Harv. Envtl. L.Rev. at p. 482; see also. May & van Rossum, supra, 20 Vt. L.Rev. at pp. 379-380.) The intake/discharge relationship also has a legal component: "the statute requires that any standard established by the EPA to govern the discharge of pollutants from existing facilities must also regulate cooling water intake structures." (Riverkeeper II, supra, 475 F.3d at pp. 122-123.) Even so, section 316(b), the sole intake provision in the entire Clean Water Act, has been described as "something of an afterthought, having been added by the conference committee without substantive comment." (Riverkeeper I, supra, 358 F.3d at p. 187, fn. 12.)

b. NPDES permits for existing plants
As explained in federal court decisions, section 316(b) applies to existing plants as they undertake the periodic NPDES permitting process. In Riverkeeper II, the court confirmed the statute's application to existing plants, saying: "Nothing in section 316(b) indicates that because it applies to the `location, design, construction, and capacity' of a facility's cooling water intake structure, the section is therefore limited to new facilities and does not require existing facilities either to modify existing intake structures or to construct new intake structures in order to come into compliance with the EPA's Rule." (Riverkeeper II, supra, 475 F.3d at pp. 121-122, fn. omitted.) The court rejected the argument "that the EPA has authority to approve cooling water intake structures only before construction and cannot regulate these structures through the NPDES permits...." (Riverkeeper II, supra, 475 F.3d at p. 121.) As the court acknowledged: "The textual basis for the EPA to regulate cooling water intake structures during the periodic permitting process applicable to the discharge of pollutants is not immediately apparent," (Id. at p. 122.) "Despite this textual hiccup," the court said, "the EPA's decision to use the NPDES process to enforce section 316(b) is not unreasonable." (Ibid.; see also, e.g., U.S. Steel Corp. v. Train, supra, 556 F.2d at p. 850.) In sum, Riverkeeper II concludes, "the EPA may regulate cooling water intake structures via the NPDES permit process. Otherwise, Congress's intent to regulate *542 the intake structures of existing facilities could not be effectuated." (Riverkeeper II, at p. 123, fn. omitted.)

c. Consideration of alternative cooling technologies
As explained by the EPA's general counsel, closed cycle systems may be considered in assessing best technology available, even though they are not technically subsumed within the statute, which governs only cooling water intake systems. "Cooling towers or other closed cycle cooling systems are not cooling water intake structures. It is clear that there is no independent basis under [section] 316(b) to require a cooling tower in a permit. However, under [section] 316(b) a permit may restrict the volume of flow or capacity of an intake structure." (General Counsel Opinion 41, pp. 5-6.) "Such a reduction of allowable capacity may necessitate the use of a closed cycle or recirculating cooling system. Section 316(b) does not, however, allow for the imposition of closed cycle cooling systems per se." (Id., at p. 3; see, e.g., May & van Rossum, supra, 20 Vt. L.Rev. at pp. 470-471.)
With that understanding of the statute's reach in mind, we now address its command to minimize adverse environmental impact through the use of the best technology available.

4. Statutory Mandate to Minimize Adverse Environmental Impact
Section 316(b) requires technology that minimizes adverse environmental impact.
The specific environmental impacts to be minimized are impingement and entrainment. In the EPA's view, they "are primary, harmful environmental effects that can be reduced through the use of specific technologies." (69 Fed.Reg. at p. 41600, supra [Phase II final regulations]; see Riverkeeper II, supra, 475 F.3d at p. 125.)
By regulatory interpretation: "Minimize means to reduce to the smallest amount, extent, or degree reasonably possible." (40 C.F.R. § 125.83 (2001) [Phase I final regulations]; see also, e.g., General Counsel Opinion 63, p. 9 [equating minimize with "reduce to the smallest possible amount or degree"].) The statute does not require the complete elimination of all impacts. As stated in the 1977 Draft Guidance: "Regulatory agencies should clearly recognize that some level of intake damage can be acceptable if that damage represents a minimization of environmental impact." (1977 Draft Guidance, p. 3.) More recently, in connection with its promulgation of the Phase II Rule, the EPA concluded "that the percent reduction of impingement mortality and entrainment is not completely within the control of a facility and therefore may not be precisely achieved by a facility." (Riverkeeper II, supra, 475 F.3d at p. 107.)

5. Statutory Mandate to Employ Best Technology Available
To satisfy the statutory mandate of minimizing environmental impact, a plant's cooling water intake system must reflect BTAbest technology available. We separately consider each of the three words in that critical operative phrase.

a. Is it a technology?
The statute is technology-oriented. (Riverkeeper II, supra, 475 F.3d at pp. 99, 114; id. at p. 108 [CWA reflects a "technology-forcing imperative"].) "BTA is an organic concept planted firmly in the CWA's technology-forcing preference, and evolves along with developments in engineering." (May & van Rossum, supra, 20 Vt. L.Rev. at p. 471.)
By way of example, design technologies may include "screening devices, use of fish *543 handling and bypass systems, pumps, trash racks, and behavioral barriers" as well as "fish ladders, fish buckets, improved fish screens, protective coatings, intake depth adjustment, modified velocity caps, and sound deterrent devices." (May & van Rossum, supra, 20 Vt. L.Rev. at p. 455.) Technologies for capacity reduction may include such things as seasonal flow reductions and upgraded screening. (Id. at p. 465.)
On the other hand, restoration measures are not a "technology" within the contemplation of the statute as construed in the Riverkeeper cases. (Riverkeeper I, supra, 358 F.3d at p. 189; Riverkeeper II, supra, 475 F.3d at pp. 108-110.) As the Riverkeeper I court explained, such measures "have nothing to do with the location, the design, the construction, or the capacity of cooling water intake structures, because they are unrelated to the structures themselves." (Riverkeeper I, at p. 189.) "Restoration measures correct for the adverse environmental impacts of impingement and entrainment; they do not minimize those impacts in the first place." (Ibid.; accord, Riverkeeper II, at p. 109.) Thus, under the express dictates of the statute, "restoration measures cannot substitute for the `best technology available for minimizing adverse environmental impact' in cooling water structures." (Riverkeeper II, at p. 108.) To the extent that the EPA's regulations allowed restoration in lieu of technology, they were struck down. (Riverkeeper I, at p. 191 [remanding that aspect of the Phase I final regulations]; Riverkeeper II, at p. 110 [remanding that aspect of the Phase II final regulations].)

b. Is it available?
In assessing whether a technology is "available" within the meaning of the statute, several elements come into play, including feasibility and costs.
The feasibility of a given technology is a relevant factor in determining BTA. (Riverkeeper I, supra, 358 F.3d at p. 196 ["EPA was entitled to consider feasibility generally"].) An assessment of feasibility properly includes site-specific considerations. As the 1977 Draft Guidance explains: "The appropriate technology is best determined after a careful evaluation of the specific aspects at each site." (1977 Draft Guidance, at p. 12.) There might be site-specific physical constraints, such as topography or the availability of fresh water. Additionally, there may be legal constraints on using a particular technology at a given site based on the application of other laws, such as those prohibiting nuisance. (See Wat.Code, § 13002, subds. (b), (c).)
In considering the availability of a technology, cost is also a factor.
Appellant observes that the statute contains no explicit authority for cost considerations, and it urges "as a general proposition" that "an agency implementing federal law may not consider costs unless the statute clearly authorizes cost considerations," citing Whitman v. American Trucking Associations (2001) 531 U.S. 457, 467-468, 121 S.Ct. 903, 149 L.Ed.2d 1. Whitman is inapposite here. As Duke points out, Whitman involved health-based air quality standards under the Clean Air Act. Under that statute, those standards had to be set high enough "`to protect public health' ... `with an adequate margin of safety'" without regard to cost. (Id. at p. 465, 121 S.Ct. 903.) As the high court recognized, however, other provisions of the Clean Air Act do permit "economic costs to be taken into account." (Id. at p. 467, 121 S.Ct. 903.) Whitman offers no basis for disregarding costs in considering the *544 availability of a technology under section 316(b). In any event, as appellant explains in its reply brief, it "does not contend on this appeal that economic considerations can never be taken into account."
As appellant acknowledges, the Environmental Protection Agency itself has read economic considerations into the provision. (See, e.g., 69 Fed.Reg. at p. 41604, supra [Phase II final regulations].) The federal courts have concurred. (Seacoast Anti-Pollution League v. Costle (1979) 597 F.2d 306, 311 (Seacoast); Riverkeeper I, supra, 358 F.3d at p. 195; Riverkeeper II, supra, 475 F.3d at p. 99.) As the Riverkeeper I court acknowledged, "section 316(b) itself is silent as to what factors the EPA should consider." (Riverkeeper I, supra, 358 F.3d at p. 195.) Nevertheless, that court concluded, "the EPA was permitted to consider cost and energy efficiency in determining the `best technology available.'" (Ibid.) However, as explained in Riverkeeper II, the agency can do so "only in a limited fashion and not as a primary consideration." (Riverkeeper II, supra, 475 F.3d at p. 99.)[14]
Over the years, a standard for economic considerations has emerged, commonly referred to as the "wholly disproportionate" test. (See generally, May & van Rossum, supra, 20 Vt. L.Rev. at pp. 473-74.) Under that test, a technology need not be employed if its costs are wholly disproportionate to the environmental benefits to be gained. This standard is reflected in both regulatory and judicial decisions. (See, e.g., General Counsel Opinion 63, p. 9; Seacoast, supra, 597 F.2d at p. 311; cf., Riverkeeper II, supra, 475 F.3d at p. 113, fn. 25.)

c. Is it the best?
To comply with section 316(b), the technology selected must be the "best" available. Although the statute's objective is to minimize impingement and entrainment, other factors may also be considered, such as energy efficiency and non-water environmental effects. (67 Fed.Reg. at pp. 17125-17126, supra.) As stated in Riverkeeper II, "the EPA could rely on factors other than impingement and entrainment in establishing BTA, such as negative environmental impacts or concerns about energy production and efficiency...." (Riverkeeper II, supra, 475 F.3d at p. 105; see also Riverkeeper I, supra, 358 F.3d at p. 196 [rejecting the argument that the EPA gave too much weight to "energy consumption and emissions" in the Phase I Rule].)
The determination of BTA is entrusted to the EPA or its delegate, in this case, the Regional Board. As we now explain, the agency must use its best professional judgment in making that determination.

6. Agency Standard for Applying Section 316(b): Best Professional Judgment
In the absence of uniform regulations or other national standards, NPDES *545 permits are issued on a case-by-case basis, with the agency using its best professional judgment. (See, e.g., Natural Resources Defense Council v. EPA (1988) 863 F.2d 1420, 1425; 66 Fed.Reg. 65256, supra [Phase I final regulations]; 67 Fed.Reg. at pp. 17122-17123, supra [Phase II draft regulations]; 69 Fed.Reg. at p. 41578, supra [Phase II final regulations].)
Using its best professional judgment, the agency thus must determine whether the applicant is using the best technology available to minimize adverse impacts. Under the statute as interpreted, that determination has both environmental and economic dimensions.

a. Environmental considerations
"Adverse aquatic environmental impacts occur whenever there will be entrainment or impingement damage as a result of the operation of a specific cooling water intake structure. The critical question is the magnitude of any adverse impact." (1977 Draft Guidance, p. 15.)
Various factors may be considered in determining an impact's magnitude.[15]
As the 1977 Draft Guidance explains: "The exact point at which adverse aquatic impact occurs at any given plant site or water body segment is highly speculative and can only be estimated on a case-by-case basis by considering the species involved, magnitude of the losses, years of intake operation remaining, ability to reduce losses, etc." (1977 Draft Guidance, at p. 11.) By way of example, that document offers one potential matrix, which factors in resource value and potential impact, then postulates: "An open system large volume intake in an area of high biological value does not represent best technology available to minimize adverse environmental impact and will generally result in disapproval. [¶] Exceptions to this may be demonstrated on a case-by-case basis where, despite high biological value and high cooling flow, involvement of the biota is low or survival of those involved is high, and subsequent reductions of populations is minimal." (Id., at p. 12.)

b. Economic considerations
As explained above, the chosen technology must reduce impact "to the smallest amount, extent, or degree reasonably possible." (40 C.F.R. § 125.83, supra [Phase I final regulations], italics added.) In terms of economic considerations, the EPA long ago stated that the application of BTA "should not impose an impracticable and unbearable economic burden on the operation of any plant subject to Section 316(b)." (41 Fed.Reg. at p. 17388, supra [EPA's initial 1976 regulations], italics added.) More recently, the court in Riverkeeper II concluded that "the EPA may permissibly consider cost ... to determine what technology can be 'reasonably borne ` by the industry" in formulating industry-wide *546 rules. (Riverkeeper II, supra, 475 F.3d at p. 99, italics added.)
The foregoing environmental and economic factors help guide the agency in making its case-by-case determination of best technology available for the particular site. With that understanding of section 316(b) in mind, we now consider how it was applied in this case.

C. Application of Section 316(b)
Appellant advances two main arguments concerning the application of section 316(b) here. First, it contends, the respondents impermissibly relied on the mitigation plan in determining BTA. Second, it asserts, the Regional Board acted with "unfettered discretion" in concluding that the costs of alternative technologies were wholly disproportionate to their benefits.
The trial court found against appellant on both issues. We review the trial court's decision, not that of the agency. (Fukuda v. City of Angels, supra, 20 Cal.4th at p. 824, 85 Cal.Rptr.2d 696, 977 P.2d 693.) "The trial court's legal determinations receive a de novo review with consideration being given to the agency's interpretations of its own statutes and regulations." (City of Rancho Cucamonga v. Regional Water Quality Control Bd., supra, 135 Cal. App.4th at p. 1384, 38 Cal.Rptr.3d 450.) The court's, factual determinations are reviewed for substantial evidence. (Ibid.)

1. Mitigation
The court rejected appellant's "claims concerning the propriety of the environmental mitigation project in the permit" on both legal and factual grounds. As a legal matter, the court determined that it was not bound by the decision in Riverkeeper I rejecting the use of mitigation measures. (See Riverkeeper I, supra, 358 F.3d at p. 189.) As the trial court put it, that decision "is not controlling here. That case addresses new construction and not the modification of existing facilities such as the plant at issue here." As a factual matter, the court stated, "the present record of the Board's proceedings, viewed in its entirety, does not show that habitat restoration was offered as a substitute for selecting the best technology available."

a. The court's legal ruling
As explained above, under federal decisional law, mitigation does not qualify as a "technology" for purposes of section 316(b). (Riverkeeper II, supra, 475 F.3d at p. 110; Riverkeeper I, supra, 358 F.3d at p. 189.) In each of the two Riverkeeper cases, the court explicitly construed the statute itself, not merely the regulations at issue. (Riverkeeper II, at p. 110 [use of restoration measures contravenes "the Act's clear language as well as its technology-forcing principle"]; Riverkeeper I, at p. 189 [restoration measures are "plainly inconsistent" with the statutory text].) In light of this persuasive federal decisional law, we may therefore assume that mitigation does not constitute a "technology" under section 316(b) of the Clean Water Act.
Nevertheless, we observe, California law makes mitigation a legitimate factor in certain circumstances. For example, a provision of state water law contained in the Porter-Cologne Act, which governs "each new or expanded coastal powerplant," expressly recognizes the availability of "mitigation measures" as one way "to minimize the intake and mortality of all forms of marine life." (Wat.Code, § 13142.5, subd. (b).)
And under the California Environmental Quality Act, an environmental impact report must include "a meaningful discussion of both alternatives and mitigation measures." (Kings County Farm Bureau v. City of Hanford (1990) 221 Cal.App.3d 692, *547 731, 270 Cal.Rptr. 650; see Pub. Resources Code, § 21102.) The same is true of the corresponding report issued pursuant to an agency's certified regulatory programit "must include alternatives to the proposed project and mitigation measures to minimize significant adverse environmental effects...." (Mountain Lion Foundation v. Fish & Game Com., supra, 16 Cal.4th at p. 127, 65 Cal.Rptr.2d 580, 939 P.2d 1280, citing Pub. Resources Code, § 21080.5, subd. (d)(3)(A).) In this case, as the lead CEQA agency, the Energy Commission was required to consider mitigation, even if the Regional Board was not.
In any event, we need not decide here whether section 316(b) categorically forecloses the consideration of mitigation measures in lieu of technology. As we now explain, we may affirm the court's ruling based on its factual component alone.

b. The court's factual determination
As noted above, after considering the administrative record as a whole, the trial court concluded that the Regional Board did not use the mitigation plan as "a substitute for selecting the best technology available."
That determination finds adequate support in the record. At the post-remand administrative hearing, only the monetary aspects of the mitigation plan were at issue. In her introductory remarks at that hearing, agency counsel reminded the Regional Board that BTA "is defined as any kind of changes to the cooling water intake structure, including location, design, construction and capacity. And so it's about the cooling water structure." She further observed that the mitigation plan was "outside the scope" of section 316(b). During the hearing, the Board's chair strictly controlled the admission of evidence on the mitigation plan, admitting evidence about its economic aspects while rejecting information about its ecological features. He issued periodic reminders that the mitigation plan "is outside the intake structure issue and is a completely different mechanism" from intake technologies. And during deliberations, board members generally limited their discussion of the mitigation plan to its valuation component. The board dealt separately with the alternative technologies for plant cooling.[16]
On this record, we find substantial evidence to support the trial court's factual determination that the Regional Board did not adopt the mitigation plan as an alternative technology for purposes of section 316(b), but instead considered it only for its relevance in monetizing environmental impacts and benefits.

2. "Wholly Disproportionate" Test
As with its mitigation arguments, the trial court cited both legal and factual *548 grounds in rejecting appellant's attack on "the propriety of the wholly disproportionate test applied by the Board in the BTA analysis." Discussing the legal ground for its ruling, the court stated: "Consideration of the costs of various technologies in individual BTA determinations, using what has come to be known as the `wholly disproportionate' test, is a reasonable reading of section 316(b)." As a factual matter, the court observed: "The Board made the determination that the cost of alternatives to once-through cooling would be wholly disproportionate to the benefits achieved. The record contains a basis for that conclusion, and cost was only one of the factors considered by the Board in arriving at its conclusion."

a. The court's legal ruling
In the legal component of its ruling, the court determined that "a reasonable reading" of the statute permits a consideration of whether the costs of a technology are wholly disproportionate to the benefits to be gained.
As explained above, regulatory documents and federal decisional law support a construction of section 316(b) that incorporates the wholly disproportionate standard. (See, e.g., General Counsel Opinion 63, p. 9; Seacoast, supra, 597 F.2d at p. 311.) Even Riverkeeper II, extensively discussed by appellant at oral argument, indirectly endorses the wholly disproportionate standard, albeit in dicta and in the context of a cost-cost variance analysis. (Riverkeeper II, supra, 475 F.3d at p. 113, fn. 25.) The Riverkeeper II court thus expressed its "discomfort with the `significantly greater than' standard" contained in the remanded regulation, "given the historical applicability of a `wholly disproportionate to' standard and the use of the latter standard in the Phase I Rule." (Ibid.)
We see no reason to reexamine that interpretation here. As we understand it, appellant's real quarrel is not with the wholly disproportionate standard per se, but rather with its application here, a point we now explore.

b. The court's factual determination
Based on the administrative record before it, the trial court affirmed the Regional Board's determination that the cost of alternative technologies was wholly disproportionate to their benefit. In its bid for reversal, appellant asserts two claims against the agency in this regard: (1) that it employed an open-ended and impermissible "reasonableness" standard in assessing costs; and (2) that the record does not support the Board's findings on this point. To determine whether the court erred in affirming the Regional Board's decision here, we first consider the standard governing the agency. We then examine the record for evidence supporting the court's approval of the agency's "wholly disproportionate" cost determination.
Agency's Discretion: As explained above, the agency exercises its best professional judgment in determining whether to issue an NPDES permit in a given case. (Natural Resources Defense Council v. EPA, supra, 863 F.2d at p. 1425.) That standard does not permit the agency to act with unfettered discretion, however. (Ibid.) An agency violates that boundary when, for example, it adopts a procedure that lacks implementation criteria. (Id. at p. 1432 [the EPA acted with unfettered discretion where it had no discernible standards for authorizing discharges of toxic pollutants above a previously established limit].)
In appellant's view, "the Board merely borrowed' the phrase `wholly disproportionate' and then turned what EPA has always viewed as an `unbearable' or `extraordinary' *549 cost test into an entirely open-ended `reasonableness' standard with neither content nor limits." Appellant complains that agency staff had no "particular definition or formula for how to apply its `wholly disproportionate' test...." And it argues that "the lack of sideboards for [staffs] reasonableness determination created the kind of unfettered discretion that `is contrary both to the letter and spirit of the Clean Water Act' and that has been expressly rejected by the courts."
In response to appellant's arguments, the Water Boards assert: "The very nature of best professional judgment dictates that the permitting agency use its best judgment to interpret a standard in the absence of regulatory guidance, and this necessarily requires the use of discretion." Furthermore, they observe, the Regional Board in this case "undertook a detailed legal and factual analysis of alternative cooling options and the benefits and drawbacks of each." They contend that the Board properly exercised its best professional judgment here.
Under a deferential standard such as "best professional judgment," the agency enjoys considerable discretion. (Cf., So. Cal. Jockey Club v. Cal. etc. Racing Bd., supra, 36 Cal.2d at p. 177, 223 P.2d 1.) In this case, we cannot agree that the lack of a rigid "wholly disproportionate" formula means that the Board acted without standards. To the contrary, in the absence of uniform regulations, the agency quite properly used its best professional judgment in deciding the complex issues presented by this permit application. It considered such factors as the magnitude of the impact, the degree to which it reasonably could be minimized, and the proportionality of the cost of doing so.
Under the circumstances presented here, the trial court did not err in approving the Board's analysis. "Judicial review is considerably deferential when `the agency's decision rests on an evaluation of complex scientific data within the agency's technical expertise.'" (Riverkeeper II, supra, 475 F.3d at pp. 126-127.) We therefore reject appellant's claim that the agency exercised unfettered discretion here.
Evidentiary Underpinnings: The trial court found that the administrative record supports the Board's determination "that the cost of alternatives to once-through cooling would be wholly disproportionate to the benefits achieved." We assess that judicial finding for substantial evidence. (City of Rancho Cucamonga v. Regional Water Quality Control Bd., supra, 135 Cal. App.4th at p. 1384, 38 Cal.Rptr.3d 450.)
Disputing the trial court's determination, appellant argues that the administrative record lacks evidentiary support for the Board's finding. In pressing that argument, appellant asserts that the $7 million mitigation fund "served as the key metric for Respondents' valuation of benefits in applying their wholly disproportionate test" and that "there is not the slimmest reed of foundation" for that calculation. In particular, appellant takes issue with the per-acre cost determination for habitat equivalency.
Respondents disagree. As the Water Boards point out, the agency "had to determine some way to quantify the benefits." The Regional Board chose "the habitat equivalency method, where the larval loss is converted to equivalent habitat acreage" and the resulting acreage equivalency is then assigned a monetary value.[17] *550 Respondents defend the resulting valuation, particularly in light of the conservative assumptions that underpin the calculation.[18]
We agree with the trial court's implicit finding that substantial evidence supports the benefit calculation. At the May 2003 administrative hearing, during its cross-examination of Dr. Raimondi, appellant observed that at "390 acres of restored habitat and $7 million"the amount to be funded by Duke"it comes out to be a little under $18,000 per acre." When asked whether a study or other analysis in the record supported that figure, Raimondi replied: "Those values come directly from the Elkhorn Slough Report." Apparently, that reference is to information from the Elkhorn Slough Foundation, which was to administer the mitigation program. The Foundation's director, Mark Silberstein, had testified at the Regional Board's September 2000 hearing. That testimony was in the record for the May 2003 hearing. During his 2000 testimony, Silberstein identified actual costs that the Foundation had paid to acquire local easements and to restore habitat. For example, the Foundation had acquired an easement on an upland ranch for approximately $5,000 per acre. It had purchased easements for "restorable wetland" at nearby Morro Cojo Slough at a cost of approximately $3,000 per acre. And the Foundation had spent "probably 500 dollars an acre to restore" 400 acres in the National Estuarian Research Reserve.
In light of this evidence, we reject appellant's attack on the evidentiary foundation for the per-acre habitat cost determination. Appellant does not challenge any other element of the "wholly disproportionate" cost analysis. Therefore, as the trial court properly concluded, the Regional Board's determination must be affirmed.

C. Conclusion
We find no merit in appellant's contentions concerning the interpretation and application of section 316(b) of the Clean Water Act. Like the trial court, we reject appellant's claim of misplaced reliance on the mitigation plan as well as its challenge to how the "wholly disproportionate" test was applied. We therefore affirm the trial court's determinations.

SUMMARY OF CONCLUSIONS
I. The judicial review provisions of the Porter-Cologne Act govern this controversy. For that reason, the superior court had jurisdiction to hear and determine this dispute over the NPDES permit.
II. The trial court's March 2003 order for administrative remand was procedurally proper, and it was supported by sufficient evidence.
III. The May 2003 administrative hearing was conducted properly. The agency did not err, either in considering new evidence in response to the court's remand order or in excluding appellant's submittal.
IV. The trial court acted properly in affirming the agency's application of section *551 316(b) of the Clean Water Act to the NPDES permit at issue in this case.

DISPOSITION
We affirm the trial court's June 2004 judgment, which denied appellant's petition for writ of administrative mandamus. Respondants (the Water Boards) and real party (Duke) shall have costs on appeal.
WE CONCUR: BAMATTRE-MANOUKIAN, Acting P.J., and DUFFY, J.
NOTES
[1] The federal law at issue here is commonly known as the Clean Water Act (CWA), which is codified at 33 U.S.C. sections 1251-1387. In keeping with the general practice in federal courts, we "refer to statutory provisions by their section in the Clean Water Act and provide the parallel citation to the United States Code only on first reference or where necessary to avoid confusion." (Riverkeeper, Inc. v. U.S.E.P.A. (2004) 358 F.3d 174, 181, fn. 2 (Riverkeeper I).) In addition, we refer to Clean Water Act statutory subdivisions in shorthand fashion. We thus refer to the provision that governs here33 U.S.C. § 1326, subdivision (b)as section 316(b).
[2] The NPDES permit refers to this proposal as both the "Environmental Enhancement Program" and the "Elkhorn Slough Enhancement Program." Over the course of the administrative and judicial proceedings, the proposal has been called by that first title, by the corresponding initials (EEP), and by other names, including: the mitigation plan; the habitat program; the habitat equivalency plan; and the habitat enhancement plan (or HEP). Its stated purpose is to increase "health and biological productivity of aquatic habitat in the Elkhorn Slough watershed." In this opinion, we generally refer to it as the mitigation plan.
[3] The court's March 2003 remand order states: "THIS COURT HAVING DETERMINED that Finding No. 48 of Regional Water Quality Control Board Order No. 00-041 is not supported by the weight of the evidence in the record. [¶] IT IS ORDERED that Order No. 00-041 be, and it hereby is, remanded to the Regional Water Quality Control Board to conduct a thorough and comprehensive analysis with respect to Finding No. 48 of said Order No. 00-041 . . ."
[4] Code of Civil Procedure section 1094.5, subdivision (e), provides: "Where the court finds that there is relevant evidence that, in the exercise of reasonable diligence, could not have been produced or that was improperly excluded at the hearing before respondent [agency], it may enter judgment as provided in subdivision (f) remanding the case to be reconsidered in the light of that evidence; or, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, the court may admit the evidence at the hearing on the writ without remanding the case."
[5] In its entirety, the Regional Board order granting Duke the challenged NPDES permit comprises more than 25 pages. The subject matter of its 58 findings ranges from the Regional Basin Plan and the California Ocean Plan to thermal discharges, impingement, and entrainment. The compliance provisions set forth as "orders" in the permit include discharge prohibitions, effluent limitations, receiving water limitations, and other "standard" provisions; none of the permit's orders specifically addresses entrainment.
[6] Duke prepared an assessment of technology alternatives, designed to address the requirements of section 316(b) of the Clean Water Act. The assessment was required by the Regional Board. Duke produced four drafts of this report between September 1999 and early April 2000. The final draft is dated April 28, 2000. It is officially entitled "Moss Landing Power Plant 316(b) Resource Assessment." We refer to it here as Duke's § 316(b) Report.
[7] Applying those four criteria to the closed cycle (draft) water tower alternatives, Raimondi concluded: (1) they are available and proven for freshwater; (2) they greatly reduce the entrainment of aquatic organisms; (3) they present other site-specific environmental issues, including saltwater "blowdown" and visual impacts resulting from their enormous size; (4) they cost $12-13 million more than once-through cooling, with an additional energy requirement of 23 megawatts of power. As for air cooled towers, Raimondi opined: (1) they are available and proven; (2) they eliminate seawater intake entirely and thus eliminate entrainment; (3) their site-specific feasibility is diminished by such problems as heat exhaust, noise, and the need for additional land; (4) the cost would be approximately $30 million for construction and $114 million over 30 years for operation and maintenance, plus 60 megawatts of additional power.
[8] The issues are set forth in the notice as follows: "1. What are the alternatives to once-through cooling for Units 1 & 2? [¶] a. Which of these alternatives are effective to reduce entrainment? [¶] b. Are there reasons that any of these alternatives may not be feasible? [¶] c. What are the costs of these alternatives to once-through cooling? [¶] d. What are the environmental benefits of each alternative? [¶] e. Is the cost of the alternatives wholly disproportionate to their environmental benefit?"
[9] As to those points, Daniels's letter states: "While the April 28 letter states in some parts that it is responding to submissions by Board staff and Duke Energy, the overwhelming majority of the letter addresses issues that were not raised by the other parties. Thus, the letter is not properly submitted as rebuttal argument or evidence. [¶] Additionally, most of the letter addresses issues outside the scope of the Order of Remand by the Superior Court of Monterey County.... Because the purpose and scope of this hearing is to comply with the Order of Remand, the issues argued in the April 28 letter are outside the scope of the hearing and so are not relevant and may be excluded."
[10] On the question of costs, the memorandum explains that "the `wholly disproportionate test' is a test of incremental cost," which refers "to the added expenditure necessary for environmental protection above and beyond the costs of normal operation. For MLPP, some technology must be employed to cool the two new generating units. Therefore, the expenditure that MLPP would make to achieve this cooling is not a cost of environmental protection, but a cost of their operations.... Therefore costs for the [wholly disproportionate] test should be the difference between the once-through cooling technology and the non-entraining alternatives." In the view of the memorandum's authors, analysis of incremental costs was lacking in this case. They state: "The Board was not directed to measure the incremental costs that MLPP would now face given that MLPP has already invested in once-through technology. Therefore, the costs have been drastically overestimated."

On the issue of benefits, the memorandum advises: "Benefits for consideration must also be incremental. In this case, the benefits would be the increase in environmental quality above the case that would result with MLPP choosing technology to achieve their cooling needs only. Therefore, the target figure is the total benefit value of environmental protection minus the environmental protection that would be achieved otherwise." As with costs, the authors of the memorandum question the treatment of benefits, saying: "The benefit calculations provided by Duke are clearly lacking. They consider direct use and nonuse values exclusively.... While only small organisms are directly affected by impingement and entrainment (I & E), the indirect effects are potentially widespread and of great value." The authors complain that Duke assessed only direct "impacts on the fish directly entrained in the once-through cooling system" without considering associated "trophic-level effects" on other biota in the ecosystem. The authors of the memorandum offer a detailed, critical analysis of the habitat equivalency method of benefit valuation used by Regional Board staff as reflected in the mitigation plan. They opine: "Not only have the benefits been incorrectly calculated, but planned mitigation is technically infeasible."
[11] Several factors support this interpretation. For one thing, just two weeks earlier, appellant had expressly declined "to submit any testimony at this time." For another thing, the April 28th letter opens by reiterating appellant's position that "the only proper course of action in this matter is to reopen the existing NPDES permit" while nonetheless seeking "to fully preserve its rights and to assist the Board's future deliberations" with the proffered "preliminary comments." Moreover, most of the letter's content appears under the heading "Additional Matters for Consideration in a New Permit Process," a title that suggests appellant's unwillingness to participate in the remand hearing then scheduled. Additionally, on the penultimate page of the letter, appellant renews its insistence on reopening the permit, stating: "In reconsidering all of these issues in a new permit process, Voices strongly encourages the Board to resist Staff's ill-conceived and illegal approach. ..." Given the foregoing, it would be reasonable to conclude that appellant did not intend its April 28th correspondence as a substantive proffer for this proceeding.
[12] Those three topics, which appear under the heading "Additional Matters for Consideration in a New Permit Process," are as follows: "1. The Clean Water Act Does Not Allow Cost Considerations to Drive the BTA Analysis." "2. The Board Cannot Selectively Evaluate Costs and Benefits If It Chooses to Base its Decision on Economic Considerations." "3. There Is No Evidence To Support The Conclusion that the Funding of Habitat Measures Will Fully (or even Substantially) Mitigate the Impacts of Once-Through Cooling."
[13] Appellant's April 28th letter refers to Soloway's legal analyses in only two places. At page 2, in its discussion of threshold issues, appellant contends that Soloway mischaracterized the court's decision as relating to a single sentence of finding number 48. At page 11, in addressing the mitigation issue, appellant states: "Counsel's Legal Analysis points the Board to EPA's discussion of restoration measures in the new Section 316(b) rules." Appellant then quotes and discusses those regulations, but without criticizing or challenging counsel's conclusions.
[14] More specifically, Riverkeeper II states, "the EPA may permissibly consider cost in [only] two ways: (1) to determine what technology can be `reasonably borne' by the industry and (2) to engage in cost-effectiveness analysis in determining BTA." (Riverkeeper II, supra, 475 F.3d at p. 99.) "Thus, the EPA must first determine what is the most effective technology that may reasonably be borne by the industry." (Ibid.) "This technology constitutes the benchmark for performance. Once this determination has been made, the EPA may then consider other factors, including cost-effectiveness, to choose a less expensive technology that achieves essentially the same results as the benchmark.';' (Id. at p. 100, fn. omitted.) By contrast, the Riverkeeper II court stressed, "cost-benefit analysis is not consistent with the requirement of § 316(b) that cooling water intake structures `reflect the best technology available for minimizing adverse environmental impact.'" (Id. at p. 114.)
[15] According to the 1977 Draft Guidance, both long term and short term magnitude should be estimated, with reference to these factors'.

"(1) Absolute damage (# of fish impinged or percentage of larvae entrained on a monthly or yearly basis);
"(2) Percentage damage (% of fish or larvae in existing populations which will be impinged or entrained, respectively);
"(3) Absolute and percentage damage to any endangered species;
"(4) Absolute and percentage damage to any critical aquatic organism;
"(5) Absolute and percentage damage to commercially valuable and/or sport fisheries yield; or
"(6) Whether the impact would endanger (jeopardize) the protection and propagation of a balanced population of shellfish and fish in and on the body of water from which the cooling water is withdrawn (long term impact)."
(1977 Draft Guidance, p. 15.)
[16] For example, during deliberations, Board Member Young summarized some of the alternatives and his analysis as to each. He said: "I have gone through in my mental checklist the cooling alternatives. And so I looked at the potential offshore intake and I don't think that's really too realistic.... [¶] I have looked at freshwater cooling towers and I think that it's infeasible because there is just a lack of a freshwater resource for this area.... [¶] Saltwater cooling, you know, it looks the most interesting to me because it has the lowest cost of the alternatives, but I'm concerned about the impact of the salt air plume continually going out and being dissipated and what unintended consequences that might have in terms of other land uses. [¶] We are left with dry cooling. And, you know, it's the Cadillac here. So it's the only alternative that would take care of the entrainment problem. And it's appealing to want to just gravitate towards that because it would solve so many problems from the water quality impact side of this, but what prevents me from making that choice is that I am not convinced that there is enough of an impact to the resource at this point that would justify that expenditure."
[17] In broad brush, the agency's habitat equivalency approach took the assumed percentage of larvae lost to entrainment (13%), and multiplied it by the surface area of the slough (3,000 acres), to arrive at an acreage equivalency (390 acres). The figure of 390 acres thus represents lost productivity due to entrainment. Calculations were then made to value those 390 acres. According to the staff report: "Based on actual, local values, the cost of purchasing and/or restoring this habitat was calculated as $1.2 million to $9.7 million." Duke was to pay $7 million to fund the habitat program.
[18] The assumptions include these: (1) that the plant runs at full capacity all the time; (2) that 13 percent of larvae are entrained; (3) that all entrained larvae die; and (4) that the loss of larvae results in a corresponding loss of adult fish.